JOHN J. BRENNAN CONSTRUCTION CORPORATION, INC.
*v.* CITY OF SHELTON ET AL.

HEALEY, PARSKEY, ARMENTANO, SHEA and BORDEN, Js.

Argued April 8—decision released August 3, 1982

*Emanuel N. Psarakis,* with whom was *Charles B. Spadoni,* for the appellant-appellee (plaintiff).

*Foster M. Young,* for the appellees-appellants (defendants).

BORDEN, J. This is an action for damages for breach of contract[1] instituted by John J. Brennan Construction Corporation, Inc. (Brennan) against the city of Shelton (city)[2] arising out of the proposed construction of a sewer system. The trial court found that a contract had been entered into, which the city had breached, and awarded damages to Brennan. Brennan appeals, claiming that the court erred in its method of calculating damages. The city cross appeals, contending that the court erred in finding that a contract had been entered into.

The trial court's memorandum of decision, as supplemented by those facts which were admitted in the pleadings and which appear from the unquestioned documentary exhibits in the case, discloses the following undisputed facts. In 1978 the city decided to extend its sewer system along Keron Drive. On or about May 15, 1978 the city issued invitation for bids #558 (IFB) for the construction of a system of sewers, including the sewers on Keron Drive. In response to and in compliance with the IFB Brennan submitted a bid proposal. The bids were opened on June 9, 1978 and Brennan was the lowest qualified bidder. Brennan, a general contractor who has been in business in Shelton for many years, has done other work for the city, including sewer construction.

---

[1] The complaint also sought injunctive relief, a declaratory judgment and a writ of mandamus, none of which is involved in this appeal.

[2] Also sued in their representative capacities were various municipal officers. Although the trial court's memorandum of decision clearly awarded damages only against the city, the judgment erroneously recited a recovery against "all defendants." On this appeal we consider the city to be the only party in interest.

There are a number of provisions of the city charter and the IFB, discussed more fully below, which are significant to this appeal. Section 6.4.4.2 of the charter designates the city's purchasing agent.[3] Section 6.4.4.3 provides for competitive bidding on all expenditures of $1500 or more.[4] Article 11 deals with the award to the lowest bidder if adequate finances are available and the rights

---

[3] Section 6.4.4.2 of the city charter reads as follows:

"6.4.4.2. Purchasing Agent: The Purchasing Agent, who may be the Director of Finance or any other person except the City Treasurer, shall purchase all goods and services, required by the City and its boards, commissions, and other bodies (except the Board of Education, with which the Purchasing Agent shall work on coordinating major purchases under single contracts), and its departments, offices, and other agencies, and its officials. The Purchasing Agent shall act upon receipt of a requisition signed by a responsible representative designated by any board, commission, other body, or department, office or other agency, or official. The Purchasing Agent shall, to the extent requested by the Chairman of the Board of Education, serve as the purchasing agent for the Board of Education. The Purchasing Agent shall hold no other elected or appointed office within the City and shall have no other employment with the City."

[4] Section 6.4.4.3 of the city charter reads as follows:

"6.4.4.3. Bidding: The Purchasing Agent shall let to bid all purchases (including those made by the Board of Education) which reasonably may involve the expenditure of One Thousand Five Hundred Dollars ($1,500.00) or more by the invitation of sealed bids, giving at least ten (10) days notice of the closing date for bids by publication at least once in a newspaper having a substantial circulation in the City. Within five (5) days after the closing date for bids, the bids shall be opened publicly by the Purchasing Agent and the Board of Apportionment and Taxation (or the Finance Committee if the authority to award contracts has been delegated). The Board of Apportionment and Taxation (or the Finance Committee if the authority to award contracts has been delegated) shall award the contract for the purchase to the lowest responsible bidder; provided, however, the City may reject any, all, or any part of any bids. If the authority to award contracts has been delegated, the Finance Committee shall award contracts only by unanimous decision and if a unanimous decision cannot be reached the matter shall be determined by the Board of Apportionment and Taxation. The Board of Alderman may establish such other regulations for purchases and bidding as it deems appropriate."

of the city if they are not.[5]  Article 13 reserves to the city the right to reject proposals.[6]  Article 16 deals with acceptance and award of the contract within ninety days of the opening of the bids.[7]

On August 4, 1978, the purchasing agent wrote to Brennan in part as follows: "The Finance Committee of the Board of Apportionment and Taxa-

[5] Article 11 of the IFB reads as follows:

"ARTICLE 11. METHOD OF AWARD—LOWEST QUALIFIED BIDDERS: If, at the time this contract is to be awarded, the lowest base bid submitted by a responsible bidder does not exceed the amount of funds then estimated by the Owner as available to finance the contract, the contract will be awarded on the base bid subject to such modification resulting from the acceptance by the Owner of any alternates listed in the bid which the Owner deems to be in his best interest. If such bid exceeds such amount, the Owner expressly reserves the right to increase or decrease any class, item or part of the work, and this reservation includes the omission of any item, or items, or parts of the work as may be decided by the Owner; or the Owner may reject all bids."

[6] Article 13 of the IFB reads as follows:

"ARTICLE 13. RIGHT TO REJECT PROPOSALS: The Owner reserves the right to reject any and all proposals or to accept the proposal or proposals which in its judgment will be for the best interests of the Owner.  Any proposal which contains any omissions, alterations of form, additions or alternates not called for, erasures or corrections or which fail to conform to the regulations stated herein, may be disregarded and rejected as improper except that the City Council may waive any defects or irregularities.  Any proposals which are submitted or received after the schedule closing time for the receipt of proposals will be rejected.  Proposals in which the prices obviously are unbalanced may be rejected."

[7] Article 16 of the IFB reads as follows:

"ARTICLE 16. ACCEPTANCE AND AWARD OF CONTRACT: Within 90 days after the opening of the bids, the City of Shelton will accept one of the bids on each contract or will reject all bids on any or all contracts.  Acceptance of the bids and Notice of Award will be in writing signed by an officer of the City and mailed to the address designated in the Proposal.  The notice shall contain appropriate instructions and information as to the time and place set for the execution of the contract.  The successful bidder or his duly authorized representatives shall appear at the time and place designated and shall execute the contract and furnish all bonds and certificates of insurance which may be required.

tion is requesting from your Company another extension of 90 days from the original date of August 31, 1978 on your bid price for this project. This would extend your bid prices until November 29, 1978. Please indicate by letter to this office no later than August 18, 1978 if this extension is agreeable or not. If you so indicate not to extend your prices, your bid bond will be released." On August 10, 1978, Brennan responded as follows: "In reference to your letter of August 4, 1978 our Company is agreeable in extending an additional 90 days on Contract 6—Bid #558."

On October 4, 1978, C-E Maguire, Inc. (Maguire), which was the city's consulting engineer on the project, wrote to Brennan advising "that subject to receipt of funding approval, the City of Shelton will be scheduling a Contract Signing in the very near future." The letter also requested Brennan to submit a number of documents, such as insurance certificates, bonds and other forms, "so that [they] may be reviewed and incorporated into the Contract Documents for the signing to be later scheduled." Under the contract documents, which include the IFB, "City" or "Owner" is defined to include Maguire. A copy of this letter also went to the mayor, sewer commission, corporation counsel and finance director of the city. On October 16, 1978, the board of aldermen, by resolution, approved the financing for the Keron Drive sewer project and authorized the sewer commission to enter into contracts on the city's behalf for the project.

In November, 1978, the city decided to do the Keron Drive sewer project itself by its public works department. It issued a new invitation for bid (IFB #590) for services, machinery and rental equipment for this purpose, these bids to be opened

on December 4, 1978. IFB #590 was advertised in a newspaper on November 22, 1978. Brennan submitted a bid on IFB #590 which, on December 4, 1978, the city determined to be the lowest bid.[3]

On November 29, 1978, the mayor notified the board of aldermen that the Keron Drive sewer project would now be done by the city public works department and the board of aldermen voted to authorize that department to perform a portion of the work on the Keron Drive sewer project, to enter into subcontracts for services, machinery and rental equipment, and to reject all bids on the IFB. On December 7, 1978, the city purchasing agent wrote Brennan that the finance committee had rejected all bids on the IFB.

## I

The trial court held that the city's right to reject all bids had to be exercised within ninety days after the bid opening on June 9, 1978; that the effect of the exchange of letters between the city and Brennan on August 4, 1978 and August 10, 1978 was to extend the city's right to reject for ninety days from August 10, 1978, or until December 6, 1978; that the city's letter of December 7, 1978 notifying Brennan of its rejection of all bids did not exercise its right to reject within the time allowed for it to do so; and that its failure to reject within that time created a contract between the city and Brennan. We disagree.

It is first necessary to clarify a factual discrepancy between the trial court's finding and the evidence. The trial court found that the city's request

---

[3] There are further facts established by the pleadings relative to IFB #590 which apparently involve claims by Brennan arising out of that transaction, which claims are not before us on this appeal.

of August 4, 1978, for an extension of ninety days and Brennan's agreement thereto of August 10, 1978, gave the city ninety days from August 10, 1978, or until December 6, 1978, to reject. Putting aside the question of the legal effect of this request and agreement, it is clear from the exhibits and from a stipulation made during the trial that the ninety day extension was meant by the parties to be until November 29, 1978, not December 6, 1978. The city's letter of August 4, 1978, to Brennan requested "another extension of 90 days from the original date of August 31, 1978 on your bid price for this project. This would extend your bid prices until November 29, 1978." Brennan's response of August 10, 1978 referred specifically to the request of August 4, 1978, in agreeing to extend "an additional 90 days . . . ." At trial the city stipulated that the city requested an extension of Brennan's bid price to November 29, 1978. The court's finding of December 6, 1978, rather than November 29, 1978, as the terminal date of the extension is not supported by the evidence and is clearly erroneous. See *Appliances, Inc.* v. *Yost,* 186 Conn. 673, 678, 443 A.2d 486 (1982). Although the scope of our review of factual material is limited; id., 676–77; because of the undisputed nature of the exhibits and the stipulation, we proceed on the factual basis that the terminal date of the extension was November 29, 1978.

We hold that no contract was created between Brennan and the city because the city's rejection of all bids, including Brennan's, as voted on November 29, 1978, by the board of aldermen and communicated to Brennan on December 7, 1978, was valid. There was no acceptance of Brennan's bid prior to that rejection.

## II

Municipal competitive bidding laws are enacted to guard against such evils as favoritism, fraud or corruption in the award of contracts, to secure the best product at the lowest price, and to benefit the taxpayers, not the bidders; they should be construed to accomplish these purposes fairly and reasonably with sole reference to the public interest. *Austin* v. *Housing Authority,* 143 Conn. 338, 345, 122 A.2d 399 (1956); 10 McQuillin, Municipal Corporations (3d Ed. Rev.) § 29.29. "The better authority holds that lowest responsible bidder statutes are enacted solely for the benefit of the public and in no sense create any rights in those who submit bids. 10 McQuillin, Municipal Corporations (3d Ed.) § 29.29." *Austin* v. *Housing Authority,* supra, 349.

A bid is a binding offer to make a contract. 10 McQuillin, op. cit., § 29.65. A bid, even the lowest responsible one, submitted in response to an invitation for bids is only an offer which, until accepted by the municipality, does not give rise to a contract between the parties. *Joseph Rugo, Inc.* v. *Henson,* 190 F. Sup. 281 (D. Conn. 1960); 10 McQuillin, op. cit., § 29.80. Furthermore, where the municipality "reserves the right to reject any and all bids, no bidder can claim any contractual rights until he has been awarded the contract." 10 McQuillin, op. cit., § 29.77. Our law has evinced a strong policy favoring the right of a municipality to exercise its reserved right to reject all bids. In *Joseph Rugo, Inc.* v. *Henson,* 148 Conn. 430, 171 A.2d 409 (1961), the lowest bidder on the proposed construction of a high school, whose bid, along with all others, was rejected, sued to restrain the city from awarding

the contract pursuant to a subsequent bid invitation. The initial invitation reserved the right to reject any and all bids. The complaint alleged that sufficient funds were available and that rejection of the lowest bid was arbitrary, unreasonable, capricious, illegal, an abuse of discretion, contrary to public policy and against the best interests of the city and its taxpayers. In upholding the trial court's sustaining of a demurrer to the complaint, we stated: "There is no allegation in the complaint which overcomes the recognized principle of law that where municipalities reserve the right to reject any or all bids they are empowered to do so. *Straw* v. *Williamsport,* 286 Pa. 41, 43, 132 A. 804 [1926]; Rhyne, Municipal Law § 10–11. It is true that certain paragraphs of the complaint allege arbitrariness, capriciousness, and similar conduct, but such conduct, if there was any, by the empowered officers is immaterial, since the right to reject all bids was asserted in the invitation to bid. *Potts* v. *Philadelphia,* 195 Pa. 619, 632, 46 A. 195 [1900]. Courts have relaxed the application of the established principle of law only where fraud or corruption has influenced the conduct of the officials. No allegation of fraud or corruption appears in this complaint.

"All that is required of officials is that they observe good faith and accord all bidders just consideration, thus avoiding favoritism and corruption. An honest exercise of discretion will generally not be disturbed. Courts will only intervene to prevent the rejection of a bid when the obvious purpose of the rejection is to defeat the object and integrity of competitive bidding. 10 McQuillin, Municipal Corporations (3d Ed.) § 29.77; *Gast* v. *Langston,* 15 S.W.2d 353 (Mo. App. [1929]); *Sand*

*Springs* v. *Hohl,* 90 Okla. 124, 128, 216 P. 138 [1923]. No justiciable right is created by an invitation to bid if the authority reserves the right to reject bids. *Austin* v. *Housing Authority,* 143 Conn. 338, 349, 122 A.2d 399 [1956]." *Joseph Rugo, Inc.* v. *Henson,* 148 Conn. 430, 434–35, 171 A.2d 409 (1961).

The city's right of rejection was stated several times in its charter and in the IFB. Section 6.4.4.3 of the charter gives the city the right to "reject any, all, or any part of any bids." Even had this right not been spelled out further in the IFB it would have been available to the city because "every person who deals with [a municipal corporation] is bound to know the extent of its authority and the limitations of its powers. 38 Am. Jur. [Municipal Corporations] 182, § 506." *Sheehan* v. *Altschuler,* 148 Conn. 517, 526, 172 A.2d 897 (1961); 10 McQuillin, op. cit., § 29.04. Here, moreover, article 27 of the IFB specifically directed Brennan's attention to the city's laws and ordinances, which included its charter.[9] In addition, the IFB unequivocally restated the city's right of rejection. Article 7 provides that "until the actual award and execution of the contract, the city of Shelton reserves all its rights with respect to the rejection of proposals." Article 13, entitled "RIGHT TO REJECT PROPOSALS," provides: "The [city] reserves the right to reject any and all proposals or to accept the proposal or proposals which in its judgment will be for the best interests of the [city]." In its bid Brennan speci-

---

[9] Article 27 of the IFB reads as follows:

"ARTICLE 27. LAWS AND REGULATIONS: The bidder's attention is directed to the fact that all applicable Federal, State and Municipal laws, ordinances, rules and regulations, codes of all authorities having jurisdiction over construction work in the locality of the project shall apply to the contract throughout and they are deemed to be included herein the same as though herein written out in full."

fically acknowledged the city's right to reject any and all bids.[10] The city's exercise of its right to reject all bids, as exercised by the board of aldermen on November 29, 1978 and as communicated to Brennan on December 7, 1978, was within its power. *Joseph Rugo, Inc.* v. *Henson*, supra, 434.

The city's broad right of rejection as expressed in its charter and in articles 7 and 13 of the IFB overrides the more particularized applications of that right as expressed in articles 11, 13, 15[11] and 17[12] of the IFB. The first sentence of article 11 indicates that where adequate funding is available the contract will be awarded to the lowest responsi-

---

[10] Although the complaint appearing in the printed record on appeal refers to the bid as incorporated as an exhibit to the complaint, the record as printed does not contain the bid. That paragraph of the complaint was admitted in the pleadings. In order to understand fully the undisputed facts of the case we have obtained a copy of that exhibit from the trial court clerk and examined it.

[11] Article 15 of the IFB reads as follows:

"ARTICLE 15. BALANCED BIDDING: Minus bidding on any item or items of the specifications is prohibited. Bids should be made on each separate item of work shown in the bid (proposal) with reasonable relation to the probable cost of doing the work included in such item, and the right is reserved to reject wholly any bid in case an item or items thereof are obviously unbalanced or appear to the Owner to be so unbalanced as to affect or to be liable to affect adversely an interests [sic] of the Owner. The attention of the bidder is called to the fact that unbalancing of bids may adversely affect the Contractor if certain portions of the work are increased or decreased as provided in the Contract Documents."

[12] Article 17 of the IFB reads as follows:

"ARTICLE 17. QUALIFICATIONS OF BIDDERS: *a.* The Owner may make such investigation as it deems necessary to determine the ability of the bidder to perform the work and the bidder shall furnish to the Owner all such information and data for this purpose as the Owner may request. The Owner reserves the right to reject any proposal if the evidence submitted by or investigation of such bidder fails to satisfy the Municipality that such bidder is properly qualified to carry out the obligations of the contract and to complete the work contemplated therein or has previously failed to properly perform or complete on time any contract."

ble bidder subject to any modifications provided as alternates in the bid. This provision does not, however, require the city to award a contract to the lowest responsible bidder simply because funds are available. Such a construction would make a nullity of the city's reserved right of rejection, reinforced by the law's strong policy; see *Joseph Rugo, Inc.* v. *Henson,* supra, 434; and would serve to create some sort of vested right in the bidder, which the law does not recognize. *Austin* v. *Housing Authority,* supra. The second sentence of article 11 indicates, perhaps somewhat redundantly to the city's general right of rejection, that faced with a situation of inadequate funding the city may choose to reallocate parts of the work to be done in order to match the funds available or may exercise its right of rejection. Similarly, article 15 and the latter portion of article 13 simply make clear, again perhaps redundantly, that any irregular, late or unbalanced bid may be rejected; and article 17 makes clear that if the city is not satisfied with the bidder's qualifications or if the bidder had previously failed properly to perform a contract the city may reject. None of these provisions, which are exemplars of typical reasons for rejection, limits the breadth of the city's general right to reject expressed in its charter and in other parts of the IFB.

There is nothing in the facts disclosed by the record that limits that right. Since Brennan's bid was but an offer to contract; 10 McQuillin, op. cit., § 29.65; the city's request of August 4, 1978 for an extension was but a request by the offeree to the offeror to extend the life of the offer from August 31, 1978 to November 29, 1978; it was not a time limitation on the city's right to reject. This is clear from the trial stipulation and from the lan-

guage of the request; "The Finance Committee of the Board of Apportionment and Taxation is requesting from your Company another extension of 90 days from the original date of August 31, 1978[13] on your bid price for this project. This would extend your bid prices until November 29, 1978. If you so indicate not to extend your prices, your bid bond will be released." (Footnote added.) There is nothing in this language or its context to indicate that it was anything more than a request to Brennan to extend the time within which its offer would be outstanding. Given the repeated references in the city charter and the IFB to the city's right of rejection, and given the strong policy in favor of that right, this letter from the city's purchasing agent cannot be taken as a self-imposed limitation on that right. To be sure, had Brennan withdrawn its unaccepted bid on November 30, 1978 it would have had the right to do so; but that does not transform Brennan's failure to do so into an act of acceptance by the city.

Brennan argues in effect that Maguire's letter of October 4, 1978 constituted acceptance.[14] More

[13] The bid; see footnote 10, supra; submitted on the form supplied by the city provided that "this bid shall be good and may not be withdrawn for a period of 60 calendar days after the scheduled closing time for receiving bids." The IFB set June 2, 1978 at 2 p.m. as the closing time for receiving bids. It is apparent that the parties considered sixty days therefrom as August 31, 1978.

[14] The letter, signed by Mr. Colantonio of Maguire, read in pertinent part as follows: "Please be advised that subject to receipt of funding approval, the City of Shelton will be scheduling a Contract Signing in the very near future." There then followed two paragraphs of requests to Brennan to submit insurance certificates and bonds required by the contract, and other forms to be completed by Brennan imparting information about Brennan for the contract signing. It concluded: "It is requested that this information be received in our office as soon as possible, so that it may be reviewed and incorporated into the Contract Documents for

specifically, Brennan urges that the letter established that the award of the contract would take place upon the approval of funding, which was subsequently voted; that the letter constituted a notice of award; and that Maguire had, by virtue of the IFB and the parties' prior course of conduct, apparent authority to act for the city in this regard.

This claim founders on factual findings of the trial court that Maguire had no authority to bind the city by this letter and that the letter was not an acceptance but was a request for information required for the contract signing. We read the first part of this finding as one of lack of actual, as opposed to apparent, authority, a reading which Brennan does not appear to dispute. Instead Brennan would have us find that Maguire had apparent authority to issue a notice of award. The issue of apparent authority is one of fact for the trial court. *Hollywyle, Assn., Inc.* v. *Hollister,* 164 Conn. 389, 395–97, 324 A.2d 247 (1973). The trial court made no such finding, and we cannot supply one.[15] See *Appliances, Inc.* v. *Yost,* supra. Nor did Brennan request the trial court to articulate further the factual basis of its decision. See *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 222n, 435 A.2d 24 (1980). Furthermore, the second part of this finding, to the effect that the letter was simply a request for information and not a notice of

---

the signing to be later scheduled. If you have any questions, please feel free to contact myself or Mr. Alvin Wolfgram, at your earliest convenience."

[15] Indeed, a substantial part of Brennan's prior course of conduct argument in this court rests on factual assertions about a prior contract between Brennan and the city, and on two exhibits (K and O) apparently introduced by Brennan in connection with that claim. The trial court made no such findings; nor would those exhibits, which we have examined, have compelled it to do so.

award, is equally fatal to Brennan's claim. It is axiomatic that, regardless of a party's actual intent, if he conducts himself so as to lead the other party reasonably to conclude that he is accepting an offer to contract, acceptance has taken place as a matter of law. *Blakeslee* v. *Water Commissioners,* 121 Conn. 163, 179, 183 A. 887 (1936). Whether a party has conducted himself so as to lead the other party reasonably to infer acceptance is a question of fact for the trial court. *Bridgeport Pipe Engineering Co.* v. *DeMatteo Construction Co.,* 159 Conn. 242, 249, 268 A.2d 391 (1970). The trial court's factual interpretation of the letter of October 4, 1978 in light of its surrounding circumstances is supported by the evidence and is not clearly erroneous. The letter itself, while it does contain language which might have been the basis of a contrary finding, also contains language which supports the trial court's finding. See footnote 14, supra. Furthermore, article 16 of the IFB provides as follows: "Acceptance of the bids and Notice of Award will be in writing signed by an officer of the City . . . . The notice shall contain appropriate instructions and information as to the time and place set for the execution of the contract." Neither Maguire nor its employee who actually signed the letter was an officer of the city,[16] nor does the letter set a time and place for signing the contract. Finally, § 6.4.4.3 of the city charter, of which Brennan is deemed to have notice; *Sheehan* v. *Altschuler, supra*; 10 McQuillin, op. cit., § 29.04; and to which Brennan's attention was directed by article 27 of the IFB, designates the board of apportion-

---

[16] Brennan concedes that the city did not comply with this provision of article 16. Brennan argues, however, that Maguire had apparent authority to issue a notice of award. We have already rejected this claim as having insufficient factual basis.

ment and taxation, or in the event of delegation of authority the finance committee, as having the authority to award competitive bids. Under these circumstances the finding that the letter of October 4, 1978 was not a notice of award must stand.

It is true, as Brennan argues, that silence may constitute acceptance of an offer if the offeree, by his words or conduct, leads the offeror reasonably to interpret that silence as such. 1 Williston, Contracts (3d Ed. Jeager) § 91C; *Blakeslee* v. *Water Commissioners,* supra. Whether such conduct took place so as to create a contract is a question of fact. See *Bridgeport Pipe Engineering Co.* v. *DeMatteo Construction Co.,* supra. There is no finding by the trial court to that effect; we cannot supply one; *Appliances, Inc.* v. *Yost,* supra, 676; nor has Brennan requested further articulation on this point.[17]

Brennan also argues that the city ratified Maguire's act by failing to notify Brennan of Maguire's lack of authority and by appropriating funds for the contract knowing of the letter of October 4, 1978; and that the city is estopped from denying the award of the contract to Brennan in that the city did not inform Brennan of Maguire's lack of authority, Brennan reasonably relied on a prior course of conduct between it and the city in

---

[17] In view of the several undisputed facts pointing away from such a finding, we do not deem it necessary for the proper disposition of the case to remand it on our own for further articulation. See Practice Book § 3060P. Among these facts are that the city charter and IFB, of both of which Brennan is deemed to have knowledge, reserved the right to reject bids; that Brennan acknowledged that right in its bid; that on November 29, 1978 the board of aldermen unequivocally voted to exercise that right; and that after the bid opening and long before November 29, 1978 the city issued a new IFB for services, machinery and rental equipment for use in construction of the same project by the public works department, to which IFB Brennan responded.

concluding that the contract had been awarded to it, and, in reliance thereon, Brennan changed its position to its detriment by purchasing insurance and bonds and by holding its men in readiness to perform. Under appropriate factual circumstances the doctrines of ratification and estoppel may be applied to hold a municipal corporation to a contract. See *Loomis* v. *Fifth School District,* 109 Conn. 700, 704, 145 A. 571 (1929); 10 McQuillin, op. cit., § 29.103.

We cannot hold either doctrine applicable here, however. The trial court made specific factual findings that neither doctrine was established. These findings are not clearly erroneous.

"The two essential elements of estoppel are that 'one party must do or say something which is intended or calculated to induce another to believe in the existence of certain facts and to act on that belief; and the other party, influenced thereby, must change his position or do some act to his injury which he otherwise would not have done.' " *Mercanti* v. *Persson,* 160 Conn. 468, 477, 280 A.2d 137 (1971). "In order to benefit from the [doctrine], a party must prove the essential elements for the application of the [doctrine] and must also 'show that he exercised due diligence to ascertain the truth and that he not only lacked knowledge of the true state of things but had no convenient means of acquiring that knowledge.' *Pet Car Products, Inc.* v. *Barnett,* [150 Conn. 42] 54 [184 A.2d 797 (1962)]." Id., 478. Here the prior course of conduct relied upon by Brennan is not part of the record on appeal. Furthermore, before changing its position Brennan certainly could have, with due

diligence, clarified any ambiguity as to Maguire's authority and as to whether Maguire's letter was a notice of award.

Ratification of a municipal contract "must be by the officer or body originally empowered to make the contract, and in the case of executory contracts in the mode and form required by law in the first instance, since ratification is equivalent to previous authorization and operates upon the act ratified in the same manner as though authority had been given originally." (Footnotes omitted.) 10 McQuillin, op. cit., § 29.106. An "illegal contract can be ratified by the municipal body with power to make the contract. *Loomis* v. *Fifth School District*, 109 Conn. 700, 703–704, 145 A. 571 [1929] ; 10 McQuillin, Municipal Corporations (3d Ed. Rev.) § 29.104." *State ex rel. Gaski* v. *Basile*, 174 Conn. 36, 40, 381 A.2d 547 (1977). Under § 6.4.4.3 of the charter only the board of apportionment and taxation or the finance committee had the power to award the contract. Article 31 of the IFB required that a contract in the form set forth in the IFB be executed; and that form provided for execution on behalf of the city by the administrative officer of the sewer commission. The board of aldermen's authorization of funds authorized the sewer commission to enter into the contract. Under these circumstances the act of the board of aldermen in appropriating those funds could not be held to be ratification of Maguire's conduct.[18]

---

[18] Brennan's argument that under General Statutes § 7-194 the board of aldermen had the general power to contract and to construct sewer systems is of no avail. Such general powers cannot prevail over the more specific charter allocation to the board of apportionment and taxation of the power to award competitive bidding contracts and the specific IFB allocation to the sewer commission of the authority to enter this contract.

This leaves for consideration Brennan's final argument, based on the conclusion of the trial court, that the ninety day period referred to in article 16 of the IFB,[19] as extended by the request of the city to November 29, 1978, constituted a hard and fast time limitation which, when not met, resulted in acceptance by the city as a matter of law.[20] We conclude that the city's right to reject was not limited in this fashion.

The first sentence of article 16 does not fix a rigid time limit which, if passed in silence, operates as acceptance of the bid. That the very next sentence provides specifically for a method of acceptance and notification of award militates strongly against such an interpretation of self-executing silence. Indeed, since the method of acceptance is spelled out but the method of rejection is not, there is more reason to read such silence as rejection than as acceptance. In any event, this provision did not impose on the city an absolute duty to respond which, if breached, would operate as acceptance as a matter of law. Cf. *M & L Homes, Inc.* v. *Zoning & Planning Commission,* 187 Conn. 232, 238–40, 445 A.2d 591 (1982).

To read that ninety day provision as Brennan would have it would be to import into the IFB a notion that, as to an unaccepted bid, time is of such essence that the city's failure to respond negatively

---

[19] See footnote 7, supra.

[20] The trial court's memorandum reads in pertinent part as follows: "The defendant city had the right to reject all the bids. However, it had to exercise that right within 90 days after the opening of the bids . . . . The defendant city did not exercise its right to reject bids within the time allowed for it to do so. It therefore was bound to give the Keron Drive work to the plaintiff. Having decided to do the work itself the defendant city is responsible in damages to the plaintiff."

within the period set amounts to acceptance. We have long held "that time is ordinarily not of the essence in transactions involving real property . . . ." *Kakalik* v. *Bernardo,* 184 Conn. 386, 393, 439 A.2d 1016 (1981) ; see also *Ravitch* v. *Stollman Poultry Farms, Inc.,* 165 Conn. 135, 148, 328 A.2d 711 (1973) ("in most cases performance at an exact time is not 'of the essence.' ") There is even more reason so to hold in a municipal competitive bid transaction such as this, where the bidder submits a bid with its own built-in shelf life,[21] and where the IFB is replete with references to the required formalities of notice of award and execution of the contract. In such a case so long as the city acts within a reasonable time of the deadline its action is valid. See *Kakalik* v. *Bernardo,* supra, 392.

This reading of article 16 is consistent with the city charter, with the other provisions of the IFB and with the purposes and policies of competitive bidding laws. When viewed against the backdrop of the broad right of rejection repeatedly reserved by the city in its charter and in the IFB, the strong policy permitting a city to exercise that right, and the purposes of competitive bidding statutes as being for the benefit of the public and not the bidder, article 16 did not operate unilaterally to limit that right.

We conclude therefore that no contract was created between Brennan and the city.

Additional counts of the complaint claimed damages arising out of IFB #590. The trial court did not rule on those claims because in its view any damages caused the plaintiff on that transaction

---

[21] See footnote 13, supra.

merged into its general claim for damages on IFB #558. Since we hold that no contract was created on IFB #558, we remand for a new trial limited to Brennan's claims arising out of IFB #590. An examination of the complaint indicates that none of those claims rests on breach of contract. Instead they assert various tort and taxpayer damage theories. It is not necessary for us to consider the question of calculation of damages raised by Brennan in its appeal, since that question does not appear likely to arise in the new trial.

There is error on the cross appeal, the judgment is set aside and a new trial is ordered on Brennan's claims arising out of IFB #590.

In this opinion the other judges concurred.