[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action by the plaintiff, Tri-J, Inc., a corporation ("Tri-J"), against the defendants City of Norwich ("City"), its Department of Public Utilities ("DPU") and C J Excavating, Inc. ("C J"), for temporary and permanent injunctions. Tri-J sought and obtained an ex parte order (Purtill, J.) restraining the City and the DPU from awarding a contract for the installation and repair of water mains to the lowest bidder, C J, and also seeks temporary and permanent injunctions to that effect and an order compelling the City and DPU to reject all bids for the contract and to rebid it.
The defendants moved to dismiss the action on the ground that Tri-J, as a disappointed bidder, had no standing to bring this action, thus depriving the court of subject matter jurisdiction. C J also moved to dissolve the temporary restraining order and the City moved that the court order the plaintiff to post a bond.[1]
The court, with the agreement of the parties, began CT Page 6422 to hear evidence simultaneously on the motions to dismiss and to dissolve the temporary injunction, as the issues were intertwined. Later, by agreement, the hearing was expanded to include the defendant's motion for posting of bond. On the final day of hearing, as the defendants had answered the complaint and closed the pleadings, the parties stipulated that all of the evidence may be considered by the court in entering a final judgment on the issue of whether the plaintiff was entitled to a permanent injunction.[2]
 I.
This action arose out of an invitation by the City and DPU to bid on a contract to furnish services for the installation and repair and replacement of water mains and related services within the City of Norwich (Bid #5165).
The contracted work is to be performed on a scheduled and emergency basis and generally involves excavation of a street to the depth of the present or proposed city water main and the repair, replacement or installation of new water pipe lines and fittings, as applicable, and back filling and repaving the affected areas.
On or about December 10, 1992, the DPU opened the four bids filed, and the defendant C J, an excavating contractor, appeared to be the lowest bidder, Ledyard General Contractors, Inc. ("Ledyard") was the second lowest bidder, and the plaintiff, who had won bids for such contracts for the past 19 or so years, the third lowest. Thereafter, Tri-J's president, Johnson, the holder of a contractor's P-7 license,[3] telephoned the DPU to inquire whether the other bidders possessed a P-7 license.[4] The DPU requested this information from the two lowest bidders and the plaintiff, but did not do so from the fourth bidder because its bid was too high in comparison to the other bids.
C J provided a copy of the requested license held by one Martilla together with a statement that it intended to subcontract with Martilla to supervise and install any work to be performed under the contract. Neither of C J's principals nor any of its employees hold a P-7 license nor held one at the time of the bid. The second lowest bidder, Ledyard, provided a copy of a P-7 license in the name of Peter Locarno, but no explanation of the nexus or CT Page 6423 relationship between Ledyard and Locarno.
On or about April 30, 1993, the City and DPU decided to award the contract for Bid #5165 to C J, and this action ensued, and no work has been performed on the contract. The City and DPU have, however, been able to have any required work done by their employees.
 II.
Tri-J, a general contractor specializing in utility construction work, essentially asserts that the lowest bidder, C J, did not conform to the requirements of the bid documents that all bidders must have a P-7 license. It further argues that even if it is not a requirement that the successful bidder have an "in house" license, that is, one available to the bidder as a principal or an employee, then the bidding invitation and documents are vague and unclear, and potential bidders without such "in house" licenses would be deterred from bidding, thus chilling the competitive process. The plaintiff thus concludes that the award of the contract to C J would be arbitrary and capricious and would violate the obligation of good faith and fair dealing imposed on the City and its DPU by the invitation to bid. The plaintiff asserts that it has standing because it is harmed, and is either acting as a private attorney general or in its capacity as a taxpayer. The defendants argue that an unsuccessful bidder only has standing in a limited number of cases; i.e., where fraud, corruption or favoritism has been shown. They also claim that the plaintiff has no standing as a taxpayer or as a rate payer, as the DPU receives no taxes from the City and is wholly self sufficient, and therefore that this court has no subject matter jurisdiction over this dispute. They further argue that even if the plaintiff has standing, the plaintiff cannot prevail because it has not shown fraud, corruption or favoritism or that the competitive bidding process was impaired by the conduct of the City and DPU officials. The court considers each of these issues in turn.
 III.
A. Our Supreme Court has recently considered the issue of standing in connection with the standing of disappointed bidders for municipal or governmental contracts CT Page 6424 to invoke judicial intervention.
 "It is a basic principle of law that a plaintiff must have standing for the court to have jurisdiction. Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy. . . . Standing is not a technical rule intended to keep aggrieved parties out of court; nor is it a test of substantive rights. Rather it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented. . . . These two objectives are ordinarily held to have been met when a complainant makes a colorable claim of direct injury he has suffered or is likely to suffer in an individual or representative capacity. Such a personal stake in the outcome of the controversy. . . provides the requisite assurance of `concrete adverseness' and diligent advocacy." (citations and internal quotation marks omitted.)
Unisys Corporation v. Department of Labor, 220 Conn. 689, 693
(1991).
In Ardmare Construction Co. v. Freedman, 191 Conn. 497,504-505 (1983), the court reaffirmed its previous holding in Spiniello Construction Co. v. Manchester, 189 Conn. 539
CT Page 6425 (1983), that "courts will intervene. . . where fraud, corruption or favoritism has influenced the conduct of the bidding officials or when the very object and integrity of the competitive bidding process is defeated by the conduct of the officials."
The court further pointed out in Ardmare, supra, that:
 "The public interest in preventing the granting of contracts through arbitrary or capricious action can properly be vindicated through a suit brought by one who suffers injury as a result of the illegal activity, but the suit itself is brought in the public interest by one acting essentially as a private attorney general; . . . and that the scope of our holding in Spiniello was to strike the proper balance between fulfilling the purposes of the competitive bidding statutes and preventing frequent litigation that might result in extensive delay in the commencement and completion of government projects to the detriment of the public."
Ardmare, supra, 504-505.
A bid, even the lowest responsible one, submitted in response to an invitation for bids is only an offer which, until accepted by the City, does not give rise to a contract between the parties. John J. Brennan Construction Corporation, Inc. v. Shelton, 187 Conn. 695, 702 (1982). An unsuccessful bidder, therefore, has no legal or equitable right in the contract. Ordinarily, then, the disappointed bidder has no right to judicial intervention.[5]
Our Supreme Court has also declared that: "[m]unicipal competitive bidding laws are enacted to guard against such evils as favoritism, fraud or corruption in the award of contracts, to secure the best product at the lowest price, and to benefit the taxpayers, not the bidders." CT Page 6426 Ardmare, supra, 504.
The evidence here indicates that Tri-J had first obtained a contract similar to Bid #5165 in 1969. Prior contracts awarded to Tri-J were for one year with options for two years, which Tri-J always extended. From 1969, up until December 10, 1992, Tri-J was always awarded the water main contract, with one exception.
The provision in the invitation for bid documents upon which the plaintiff heavily relies upon states: "In keeping with the Rules and Regulations of the State Board of Plumbing and Piping Examiners a P-7 contractor license is a definite requirement for all bidders." The City and DPU consistently appeared to interpret the bidding documents to require an "in house" P-7 license, however, there was no evidence that any lowest bidder in prior years did not have an "in house" license or that such a bidder was rejected or declared ineligible. There was also no evidence that any interested persons without "in house" P-7 licenses were discouraged from bidding by City or DPU officials. Tri-J's principal, Johnson, testified that he studied for and obtained a P-7 license to enable his company to be a "responsible bidder."
This prior interpretation by the DPU and the City is borne out by their failure to immediately award the contract in this case to the lowest bidder, C J, which did not have such a license.
In fact, the officials responsible for the intended award to C J were not certain of their ability to do so, in the light of their own bidding regulations, and referred the matter to the City attorney. Only after receiving counsel's advice did they decide about five months after the bid opening to award the bid to C J.
In Ardmare, supra, 506, in a case where the lowest bidder was rejected for stamping its president's signature on the bid form instead of one personally signed, the court held the lowest bidder to be without standing, and said: "Noticeably absent in this case are elements traditionally thought to undermine the competitive bidding process. The commissioner did not apply the requirement inconsistently or in a discriminatory fashion. Nor was there any proof that CT Page 6427 the Commissioner was acting in bad faith. In short, the Commissioner made a good faith interpretation of the competitive bidding statute requirements and applied it in a consistent fashion." (emphasis added).
In this case, the plaintiff points to no fraud or corruption, nor is it able to. Also, the officials involved acted in good faith, and showed no favoritism. Although the court notes that the plaintiff was not the second lowest bidder, but the third lowest bidder, there was no evidence that the P-7 license proffered by Ledyard was "in house." Therefore, if the plaintiff's interpretation of the bidding documents is correct, the plaintiff would then advance to the position of "lowest responsible bidder." On the other hand, if Ledyard's license was in fact "in house," then by the terms of the bidding documents plaintiff would "be considered a backup contractor, if the successful bidder is too busy or. . . not available." Plaintiff's Exhibit B, page 8. However, under the circumstances of this case, where there appeared to be a long standing custom of appearing to require an "in house" P-7 license, reinforced by the above-quoted language in the bid document that "a P-7 license is a definite requirement for all bidders," the court concludes that this abrupt change in determination of bidder eligibility conferred the requisite standing upon the plaintiff as a `private attorney general' to raise the issue of whether "the very object and integrity of the competitive bidding process is defeated by the conduct of the officials." Ardmare, supra, 504-505.
B. The plaintiff also claimed that it had standing as a taxpayer. Paragraph. 15 of its amendment to the complaint alleges that it is harmed as both an unsuccessful bidder and as a taxpayer, however, the allegations of harm relate solely to its status as an unsuccessful bidder. However, in paragraph 16 of its amendment to the complaint, it alleges that it will suffer increased taxes in that bids of potential bidders without P-7 licenses were not received which could have been lower than that of C J, thereby resulting in increased taxes to Norwich taxpayers. A taxpayer must show, in order to have standing, that he has suffered a pecuniary or other direct loss in that capacity. Cassidy v. Waterbury, 130 Conn. 237, 247 (1943).
As C J aptly point out in its brief, a plaintiff CT Page 6428 who relies on taxpayer status for standing must "prove that the transaction involved will probably result, directly or indirectly, in an increase in his taxes as would, in some other fashion, cause irreparable injury. American-Republic, Inc. v. Waterbury, 183 Conn. 523, 526 (1981). That court further stated, at page 526, "A plaintiff passes this threshold of standing only if a probable increase in his tax burden from the challenged activity has been shown. . ."
Although the plaintiff showed that it was a taxpayer, and further showed that the City may contribute funds for capital expenditures to its DPU, the plaintiff failed to show any harm to itself as a taxpayer in the event C J's bid was allowed to stand.
First, there is no showing that the City funds the day-to-day operations of its DPU. The evidence, as required by Chapter XII, Section 6 of the City's charter, is to the contrary. That provision provides for a budget to be prepared by the DPU and that not less than ten percent (10%) of the DPU's gross revenues in the preceding year be turned over to the City. Hence, the plaintiff has shown no direct or indirect correlation between the costs and expense of the water main contract and its effect on the City's tax revenues.
Second, there was no proof by the plaintiff that there was any degree of probability that there were any potential bidders without "in house" P-7 licenses who would have entered lower bids than C J, or that if the project were re-bid, of any probability of lower bids.
Accordingly, the plaintiff has not shown that it has standing as a taxpayer.
 IV.
The plaintiff asserts that the City and DPU incorrectly interpreted their own bidding documents and instructions, and claims that a responsible or eligible bidder must have either a principal or employee who holds an active P-7 license. The court disagrees.
The plaintiff relies heavily on the paragraph in the Request for Quotation which states: CT Page 6429
"NOTE: In keeping with the Rules and Regulations of the State Board of Plumbing and Piping Examiners, a P-7 contractor license is a definite requirement for all bidders." Exhibit 3, page 5. As previously noted, General Statutes20-337 does not require that any entity providing work or services under the aegis of the statute be controlled or owned by a licensed person. Nor do the applicable state regulations. Plaintiff's Exhibit A. The core requirement is that certain of the work or services called for by the contract be performed by properly licensed persons.
It is also elementary that the bidding documents must be read as a whole when attempting to interpret them. Included in the bidding documents furnished to each potential bidder are the specifications and general conditions. Plaintiff's Exhibit B. In the general conditions are the following pertinent provisions:
Para. 5. If subcontractors are employed same [insurance] limits as named above shall apply and the certificate of insurance must be filed with the department.
Para. 6. The contractor shall indemnify and save harmless the city against any and all damages. . . arising out of [these] operations. . . including operations of subcontractors and acts or omissions of employees or agents or contractor or his subcontractors.
Para. 15. Sub-Contracts.
The contractor agrees to obtain the agreement of every sub-contractor to be bound to terms and conditions materially and substantially comparable to those contained herein unless otherwise authorized and approved by the [DPU].
Para. 16. Assignment.
. . . The contractor [shall not] subcontract any substantial portion of this contract without [DPU's] written consent.
Para. 19. Contractor shall. . . cause all his sub-contractors to furnish, maintain and use all necessary safety devices and safe practices in prosecution of the CT Page 6430 work. . . . [c]ontractor shall defend, indemnify and save harmless the city. . . from any injury or damage. . . caused by an act, omission or neglect of the. . . subcontractor. . . from claims of defect in violation of 13a-149, Connecticut General Statutes.
Para. 43. Payment to sub-contractor.
The [DPU] assumes no obligation to pay or see to the payment of any sum to the sub-contractor.
Additionally, the documents provide that prevailing wage rates must be paid by contractors and subcontractors except as exempted by Public Act 79-325.
Also, the request for Quotation, Plaintiff's Exhibit B, page 7, provides: "The Department will consider the pipe laying contractor as the prime contractor in the event that a subcontractor may be employed for temporary and/or permanent resurfacing or any other subcontractor work, and to eliminate conflict of responsibility, the Department will hold the pipe laying contractor responsible. . ." (emphasis added)
Nowhere do the bidding documents say that a bidder must be controlled or owned by a P-7 licensee, or have such a licensee on its payroll as an employee. Nor do the documents prohibit the use of a sub-contractor holding such a license. Nor do they prohibit a joint venture or partnership involving a P-7 licensee. Nor does the plaintiff point to, or can the court discern any rational basis for a distinction between a bidder having an "in house" license or having one available by subcontract, joint venture, or other means. Rather, a plain reading of the bidding documents as a whole, compels the conclusion that they only require that a P-7 licensee perform the work which the statute and regulations require to be done by a licensee.
In the present case, as in Ardmare, supra, C J was not given any special advantage over the plaintiff or other bidders in submitting its bid; nor, was it privy to any secret or undisclosed information.
"All that is required of officials is that they observe good faith and accord all bidders just consideration, CT Page 6431 thus avoiding favoritism and corruption. An honest exercise of discretion will generally not be disturbed." Joseph Rugo, Inc. v. Henson, 148 Conn. 430, 434 (1961).
Here, the City and DPU officials involved in the bidding process, with the assistance of City counsel, fairly and reasonably interpreted their bidding documents in an effort "to secure the best product at the lowest price, and to benefit the [rate payers], not the bidders." They acted in good faith, and in the exercise of the discretion imposed upon them to protect the public interest.
Also, there was no evidence that any interested persons or potential bidders without an "in house" P-7 license were told by bidding officials in the past that they were not eligible to bid. Nor was there any evidence that in past years any lowest bidder was declared ineligible for lack of such a license. Nor is there any evidence that such interested persons or potential bidders were deterred from bidding on this contract over the past twenty years. Hence, as there was no opportunity until now for bidding officials to make the determination that bidders not possessing "in house" P-7 licenses were eligible to bid, the present determination that C J was eligible and could subcontract P-7 work cannot be termed inconsistent.
This is not the situation dealt with in Blakeslee Arpaia Chapman, Inc. v. City of New Haven, et al, Civil No. N-83-497 D. Conn., (October 27, 1983) (Burns, J.), upon which the plaintiff strongly relies. There, the second lowest bidder was found to have standing because the lowest bidder failed to submit with its bid required certifications that it would utilize in the work minimum percentages of women and minority business enterprises. Nor is this the situation in Spiniello, supra, where favoritism was found when the bidding officials allowed a single bidder to combine two separate bids to achieve a lower total bid, when the other bidders were not given the opportunity to do so. Nor is this the situation dealt with in Community Associates, Inc. v. City of New Haven, 6 CSCR 938 (October 1, 1991) (Hodgson, J.), where the court found standing when the responsible lowest bidder was rejected and the contract divided so as to favor another bidder whose board of directors had more local residents. As the bidding documents contained no such criterion, and the choice was based on "unwritten regulations" of uncertain and CT Page 6432 shifting content which preferred local residents, the court found favoritism and the necessary standing to invoke injunctive relief.
The scenario here, rather, is somewhat closer akin to that in Premier Roofing v. Dept. of Public Works, CV91-702631, J.D. Hartford-New Britain at Hartford, (April 10, 1992) (Aronson, J.), where the DPW awarded the contract to the lowest bidder. The second lowest bidder sought injunctive relief on the ground that the work to be done exceeded the "threshold limits' described in General Statutes20-341gg and thus required licensing under Chapter 393. The DPW, which had a concurring opinion from the State Building Inspector, despite a conflicting opinion from the Commissioner of the Department of Consumer Protection, interpreted the statute in a manner which did not disqualify the lowest bidder. Judge Aronson found that at most, the plaintiff had alleged that the DPW had misinterpreted the statute, and this this claim on its face did not give the plaintiff the limited standing provided to disappointed bidders provided in Spiniello, supra, because the "construction company was not given any special advantage over the plaintiff in submitting its bid, nor was it privy to any secret information." Ardmare, supra, 506.
Accordingly, the plaintiff's claim that the defendants City and DPU misinterpreted their own regulations or acted inconsistently and arbitrarily in deciding to award the contract to an unqualified bidder and defeated the very object and integrity of the bidding process fails.
 V.
The plaintiff also essentially asserts that the bidding documents are so ambiguous and unclear as to the need for a P-7 license, that as a result many other potential bidders would have entered bids, if they would have known that an "in house" P-7 license was not required. The court disagrees. First, as already discussed in Part IIIA of this opinion, the plaintiff has failed to prove that any such potential bidders existed or would have bid, if they knew they could have met the P-7 requirement by means of a subcontractor. Moreover, the invitation to bid prominently advised interested bidders that they could obtain information from the City's purchasing agent. Also, paragraph 9 of the CT Page 6433 general conditions provides in part: "If bidders fail to fully understand any clause or requirement of the specifications, inquiry must be made of the [DPU's] superintendent for his interpretation of the specifications in advance of the submission of a bid." The specifications specifically include qualifications for acceptable bidders. If any person was interested in bidding and had a question concerning the license, he could have inquired. No such inquiries were received. Moreover, undercutting plaintiff's claim, C J which did not have an "in house" license, did bid despite the claims of ambiguity in the bidding documents.
The plaintiff has simply failed to sustain its burden of proving that any ambiguities in the bidding documents "chilled" the pool of likely bidders, and defeated the very object and integrity of the bidding process. Hence, this claim fails.
For the reasons previously stated, the court enters the following orders:
The temporary restraining order is dissolved; the applications for temporary and permanent injunctions are denied; and judgment shall enter for the defendants. In light of the foregoing, the court does not reach the issue of whether the plaintiff must post a bond.
At the conclusion of oral argument on June 15, 1993, the parties reserved the right to file briefs on or before June 18, 1993. The plaintiff filed an application for a stay pursuant to General Statutes 52-476 and/or Practice Book 4047.
Applications for a stay of execution brought pursuant to Practice Book 4047 are ordinarily addressed to the sound discretion of the court. See In re Bromell G.,214 Conn. 454, 462 (1990). The purpose of General Statutes52-476 is to insure the maintenance of the status quo pending determination of the appeal by providing that the temporary injunction shall stand even though, as here, a permanent injunction was denied.
Granting a temporary injunction also lies within the sound discretion of the court. See Covenant Radio Corp. v. Ten Eighty Corp., 35 Conn. Sup. 1, 3-4 (1977). What the CT Page 6434 plaintiff seeks by the application for a stay under General Statutes 52-476, in effect, is the granting of a new temporary injunction. See H. O. Canfield Co. v. United Construction Workers, 134 Conn. 623, 627 (1948).
In determining whether to grant or deny the application for a stay, under either Practice Book 4047 or General Statutes 52-476, the court must act only within the exercise of its sound discretion. The court notes that the original temporary restraining order was issued ex parte, upon affidavit only, while this court's order dissolving the temporary order and denying a permanent injunction was after a full hearing on the merits. Assuming, without deciding, that such an ex parte order is within the operation of General Statutes 52-476 or Practice Book 4047, the court must also consider that the plaintiff would have had to show that its legal right to an injunction was clear, and that it would sustain irreparable injury if not granted, and also lacked an adequate remedy of law. Moreover, the court must balance the competing interests of the parties and the harm or injury which may be caused to one party or another. The court must also consider the effect of a stay upon other parties to the proceeding and the public interest involved. See Griffin Hospital v. Commission on Hospitals and Health Care, 196 Conn. 451, 456-457. Also, where the granting of injunctive relief will result in embarrassment to operations of government, a court must act with extreme caution. Wood v. Town of Wilton, 156 Conn. 304, 310 (1968).
The court cannot find that plaintiff's application for a stay was made only for delay and not in good faith. However, the court does find, after considering all of the factors previously discussed, that the plaintiff has not shown a clear legal right to relief, and that the continuation of the temporary injunction would unduly restrict and hamper the ability of the City and its DPU to provide necessary services to its citizens, including emergency work, and unduly interfere with their governmental operations, and also adversely affect C J so that great and irreparable injury will be done if the ex parte order were allowed to continue.
Therefore, the application for stay pursuant to General Statutes 52-476 or Practice Book 4047 is denied. CT Page 6435
Teller, J.