[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION MOTION TO DISMISS
 I. Introduction and Factual Background
CT Page 7672
The plaintiff A. Laugeni Son, Inc. (hereinafter "Laugeni") has filed the instant action seeking a temporary and permanent injunction against the defendant, State of Connecticut, Department of Transportation (hereinafter, the "DOT"), from awarding construction project No. 124-151 for the painting and rehabilitation of two bridges, numbers 00587 and 00588, to anyone other than itself and/or implementing any contract for the performance of the job with the low bidder Jupiter Painting Contracting Company, Inc. (hereinafter, "Jupiter").[1] The plaintiff argues that as it was the second low bidder[2] and as Jupiter's bid should be deemed "non responsive", the DOT's award of the project to Jupiter is evidence of favoritism.
On January 27, 1995, the DOT filed a motion to dismiss alleging that this court lacked subject matter jurisdiction. On February 21, 1995, the plaintiff amended its complaint pursuant to P.B. § 175 adding a second count, namely that Jupiter's bid violated certain requisite disadvantage business enterprise/women business enterprise set asides. The hearing on the motion to dismiss was completed on March 17, 1995 and the parties submitted briefs on June 12, 1995. By agreement, the second count was not considered in the motion to dismiss.
 II Discussion
 A.
1.
The DOT has raised four grounds in this motion to dismiss: (1) the action is barred by sovereign immunity; (2) the plaintiff has no contract with the DOT and is thus precluded pursuant to General Statutes § 4-61;[3](3) the plaintiff has no standing to challenge the award; and finally, (4) as the awarding of the contract is discretionary, the plaintiff is not entitled to the contract even if Jupiter's bid is found to be nonresponsive.
2.
A motion to dismiss "properly attacks the jurisdiction of the court, essentially asserting the plaintiff cannot as a matter of CT Page 7673 law and fact state a cause of action that should be heard by the court." (Emphasis in original.) (Citations omitted.) Gurliacci v.Mayer, 218 Conn. 531, 544 (1991). "The doctrine of sovereign immunity implicates subject matter jurisdiction. . ." Amore v.Frankel, 228 Conn. 358, 364 (1994). Because the defendant has brought to the attention of the court the possible absence of subject matter jurisdiction, this must be passed upon "before this matter can move one step further; as any movement is necessarily the exercise of jurisdiction." Baldwin Piano OrganCo. v. Blake, 186 Conn. 295, 297 (1982).
"When a court decides a jurisdictional question raised by a pretrial motion to dismiss, it must consider the allegations in the complaint in their most favorable light." Reynolds v. Soffer,183 Conn. 67, 68 (1981). It is in this posture that the court will examine the pleadings to determine whether this court has subject matter jurisdiction.
3.
The competitive bidding process obviously exists to protect the public from favoritism as well as to insure the lowest responsible cost for a public project. General Statutes §13a-95 provides, in part, that "all bids shall be submitted on forms provided by the Commissioner and shall comply with the rules and regulations provided in the specifications. . . . The Commissioner may reject any and all bids if, in his opinion, cause exists therefore; but otherwise he shall award the contract to the lowest bidder whom he deems responsible."
It is a well-established rule that an unsuccessful bidder generally has no standing to challenge a bid award. As our Supreme Court has stated:
 [a] bid, even the lowest responsible one, submitted in response to an invitation for bids is only an offer which, until accepted by the municipality, does not give rise to a contract between the parties. John J. Brennan Construction Corporation, Inc. v. Shelton, 187 Conn. 695, 702 (1982), citing Joseph Rugo, Inc. v. Henson, 190 F. Sup. 281 (D.Conn. 1960); (remaining citations omitted). An CT Page 7674 unsuccessful bidder, therefore, has no legal or equitable right in the contract. Not unlike any other person whose offer has been rejected, the disappointed bidder has no right to judicial intervention.
Ardmore Construction Co. v. Freedman, 191 Conn. 497, 502 (1983). The Supreme Court has also stated:
 An honest exercise of discretion will not be disturbed so long as its officials observe good faith and accord all bidders just consideration in accordance with the purpose of competitive bidding. Courts will intervene to prevent the exercise of that discretion to deny a bid, therefore, only where fraud, corruption or favoritism has influenced the conduct of the bidding officials or when the very object and integrity of the competitive bidding process is defeated by the conduct of municipal officials.
Spiniello Construction Co. v. Manchester, 189 Conn. 539, 544
(1983).
To the extent favoritism and an undermining of the bid process has been alleged, this court has jurisdiction to determine whether such action occurred. Id.; see UnisysCorporation v. Department of Labor, 220 Conn. 689, 693-5 (1991). Indeed, an evidentiary hearing is required. Id. Moreover, the defense of "sovereign immunity does not bar suits against officials of the state who act in excess of their statutory authority." Id. 698.
 B.
The plaintiff's claim of favoritism is based on Jupiter's alleged failure to comply with and the DOT's alleged failure to enforce certain provisions of the bid documents concerning the need for certification. The main issue in this dispute is whether all bidders must be certified by the Structural Steel Painting CT Page 7675 Council (hereinafter, "SSPC")[4] and whether evidence of such certification must be submitted with the bid documents. The invitation to bid document dated October 5, 1994 contained a provision that stated:
SPECIAL NOTICE TO CONTRACTOR
Non-Responsive Bids
 The following documentation will be required with the bidpackage. If these documents are not submitted, the bid will beconsidered non-responsive.
 Proof of Certification that the bidding contractor is certified by the Structural Steel Painting Council (SSPC) Painting Contractor Certification Program (PCCP) QP-1 AND QP-2. This certification must be maintained during the Contract period.
(Emphasis supplied).
Jupiter had submitted a letter with its bid indicating that while it was QP-1-certified, its application for QP-2 certification was pending with the SSPC and that it anticipated the review process would be completed by December 14, 1994, the bid opening date. The plaintiff was both QP-1 and QP-2-certified at the time of its bid and submitted proof with its bid documents. On December 8, 1994, however, as a result of certain discussions among DOT staff, including the recommendations of Sebastian Cianci, the Transportation Manager of Contracts, the DOT issued an addendum to its bid documents changing the "will be considered non-responsive" phrase to "may be considered non-responsive." Specifically, it stated, in part:
SPECIAL NOTICE TO CONTRACTOR
Page No. 2 — General
Non-Responsive Bids
Revise first paragraph as follows:
The following documentation shall be required with the bidpackage. If these documents are not submitted, the bid may beCT Page 7676considered non-responsive.
On December 19, 1994, after its audit was completed, (and after the bids were opened), Jupiter received notification of its QP-2 certification[5] from the SSPC and notified the DOT. On February 21, 1995, over Laugeni's objection, the DOT awarded the contract to Jupiter.
Laugeni claims that the amendment only changed the documentation that should be submitted, but did not change the requirement that Jupiter had to be QP-2 certified as of the bid opening. It maintains that Jupiter's bid should be deemed non-responsive since Jupiter did not have QP-2 certification on said date. Moreover, it also argues that any DOT action awarding the contract to Jupiter would defeat the integrity of the bidding process and indicate favoritism on behalf of the DOT since it was in a position to withdraw from the process, if it deemed its bid too low, without jeopardizing its bid bond[6][7]. Finally, Laugeni also notes that notwithstanding the December 8, 1994 amendment, on January 17, 1995, the DOT issued a notice for another contract in which it required the contractors to be both QP-1 and QP-2-certified prior to the bid opening.
The DOT, through Mr. Cianci, not only rejects that interpretation, but also stresses that the purpose of the change from "will" to "may" was to increase the number of certified contractors (and thus, the number of possible bidders). At the hearing, Mr. Laugeni testified that while 20 contractors had been certified in November only one (Jupiter) was added in the two months thereafter.
 C.
1.
This court does not believe that the plaintiff has proved that the DOT's actions evidence favoritism or undermines the integrity of the bid process. First, this court does not agree with the plaintiff's interpretation of the amendment language. Mr. Cianci's testimony indicated that the purpose of the change was to allow other contractors to become certified. The DOT's position that a bidder need only be certified as of the date of the contract award (rather than as of the date of the bid opening) is not unreasonable. An agency's interpretation is entitled to deference. Diamond v Marcinek, 226 Conn. 737, 748
CT Page 7677 (1993).
As Mr. Cianci testified, in November there were probably only2-3 certified bidders for large projects, such as the one in controversy, and the DOT wanted a larger pool, preferably five or more bidders. He indicated that the original "will" language caught him by surprise and, that at a staff meeting, he stated that such language would exclude bidders who either were in the process of being certified or might not have attached the appropriate documents. The evidence does not support the plaintiff's argument that the amendment only increased the total pool by one contractor. At trial, the parties reviewed a chart prepared by Mr. Cianci which listed all the DOT prequalified painting contractors as of March 15, 1995 and the dates of their certifications. As mentioned, Jupiter became QP-2 certified on December 19, 1994. Additionally, however, Sipco Services Marine Inc. became QP-2 certified on January 19, 1995 and Shipview Corporation received its certification on February 14, 1995. Another document, entitled "Painting Projects Bid January 1994 through January 1995" also reviewed the QP-1 and QP-2 status of the painting contractors. This document showed, for example, that in connection with the "Waterbury project," the amendment allowed more contractors to bid, resulting in a lower cost to the state. Interestingly enough, the document also showed that in one case, the plaintiff was the low bidder, notwithstanding other bids in which contractors were either not certified or did not enclose SSPC documentation. Additionally, in one case, Jupiter, although the lowest bidder, had its bid rejected as non-responsive.[8]
Mr. Cianci also testified that in no case did any of the low bidders, who were not certified at the time of submission, attempt to withdraw their bids.
2.
According to the testimony of Jupiter's President, Joyce Tsourous, the SSPC audits all applicants as part of the certification process. It will not schedule an audit until the application is deemed complete. While the applicant has the duty to submit the appropriate paperwork, the review process and the audit scheduling are totally within the control of the SSPC. In Jupiter's case, while the QP-2 application was filed on September 30, 1994, it was not deemed complete until November 29, 1994 due to, in part, the SSPC annual meeting and the Thanksgiving holiday. Indeed, the SSPC has only 2 auditors to cover the whole country and each contractor must be audited yearly. Jupiter's CT Page 7678 field audit was scheduled for December 6, 1994 and the office audit, for December 14, 1994. The bids, of course, were opened on December 14, 1994 and QP-2 certification was received on December 19, 1994. It is clear that Jupiter honestly attempted to get its QP-2 certification as soon as possible. There is no indication that it was attempting to manipulate a process so that it could later decide to withdraw its bid.
3.
This court finds that there is simply no substance to the plaintiff's claim that either favoritism was shown or that the bid process has been undermined. The proof indicates just the opposite. The DOT's actions to increase the bidding pool allowed the state to receive more bids and thus lessened any possible claim that the DOT was showing favoritism by limiting the bidding to a few contractors. To the extent the plaintiff has failed to meet its burden, Spiniello Construction Co. v. Manchester, supra,189 Conn. 539, the motion to dismiss the first count is granted.[9]
Berger, J.