# CHERYL TERRY ENTERPRISES, LTD. *v.*
# CITY OF HARTFORD
# (SC 17067)

Sullivan, C. J., and Borden, Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.[1]

---

[1] This case was argued on May 19, 2004, before a panel of this court consisting of Chief Justice Sullivan and Justices Norcott, Katz, Vertefeuille and Zarella. Thereafter, the court, pursuant to Practice Book § 70-7 (b), sua sponte, ordered that the case be considered en banc. Justices Borden and Palmer were added to the panel, and they have read the record and the briefs, and have listened to the tape recording of the original oral argument.

(*Two justices concurring and dissenting in one opinion*)

Argued May 19—officially released August 31, 2004

*Ralph J. Monaco*, with whom was *Thomas J. Londregan*, for the appellant (plaintiff).

*Ann F. Bird*, assistant corporation counsel, with whom, on the brief, was *Alexander Aponte*, corporation counsel, for the appellee (defendant).

*Richard D. O'Connor*, with whom, on the brief, was *George J. Kelly, Jr.*, for the appellee (Laidlaw Transit, Inc.).

*Opinion*

KATZ, J. In *Cheryl Terry Enterprises, Ltd.* v. *Hartford*, 262 Conn. 240, 242, 811 A.2d 1272 (2002), the plaintiff, Cheryl Terry Enterprises, Ltd., appealed from the judgment of the trial court setting aside the jury's verdict for the plaintiff on its antitrust claim against the defendant, the city of Hartford. We concluded therein that the plaintiff had not appealed from a final judgment because the trial court had not yet resolved the plaintiff's remaining claim for permanent injunctive relief. The case thereafter was reclaimed to the trial list and, following additional hearings and briefing from the parties, the trial court denied the plaintiff's request for a mandatory injunction. Thereafter, the plaintiff appealed from the judgment of the trial court to the

Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

In the present appeal, the plaintiff claims that the trial court improperly: (1) set aside the jury's verdict on its antitrust claim on the ground that, under our decision in *Lawrence Brunoli, Inc.* v. *Branford,* 247 Conn. 407, 722 A.2d 271 (1999), the plaintiff, an unsuccessful lowest bidder in a municipal bidding process, lacked standing to bring an antitrust claim against the defendant; (2) determined that it could effectively repeal Connecticut's antitrust statute in cases involving municipal bidding; (3) set aside the jury's verdict on the plaintiff's antitrust claim on the ground that the plaintiff had failed to present sufficient proof of damages; (4) directed a verdict for the defendant on the plaintiff's equal protection claims; and (5) failed to award the plaintiff mandatory injunctive relief.

We conclude that the trial court improperly set aside the verdict on the ground that the plaintiff lacked standing to bring an antitrust claim for damages against a municipality arising out of the municipal bidding process. We conclude further that the trial court improperly set aside the verdict on the ground that the plaintiff had not proved its damages to a reasonable certainty. In light of that conclusion, we need not address the plaintiff's claim that the trial court improperly granted the defendant's motion for a directed verdict on its equal protection claims. Finally, we conclude that the trial court properly denied the plaintiff's request for injunctive relief. Accordingly, we reverse in part the judgment of the trial court.

The relevant facts and procedural history are set forth in our opinion in *Cheryl Terry Enterprises, Ltd.* v. *Hartford,* supra, 262 Conn. 240. "The plaintiff is a school bus company based in Hartford. The president of the

company, Cheryl Terry, has worked in the school transportation business for more than thirty years. The plaintiff was one of three vendors who had submitted sealed bids to the defendant in response to an invitation to bid for a proposed five year contract to provide bus transportation services for the Hartford public schools, commencing with the 1998–1999 school year. The plaintiff's bid was lower than either of the other vendors, Laidlaw Transit, Inc. (Laidlaw), and Dattco, Inc. (Dattco). Despite being the highest bidder, Laidlaw was awarded the five year contract.

"After Laidlaw was awarded the contract, the plaintiff brought the action underlying this appeal, claiming violations of its equal protection rights and state antitrust law[2] . . . . The plaintiff also claimed that, by awarding the contract to an entity other than the lowest responsible bidder, the defendant violated § 2-548 of the Hartford municipal code.[3] The plaintiff's complaint alleged a violation of the Connecticut Antitrust Act (act); General Statutes § 35-24 et seq.; in that it was not awarded the contract due to a conspiratorial agreement between a [labor] union and the defendant, with the purpose of obtaining a union contract.[4] The plaintiff sought tempo-

[2] The plaintiff's complaint also contained a breach of contract claim, which was dismissed by the trial court prior to trial. The plaintiff has not appealed from that ruling, and, therefore, it is not before us in the present appeal.

[3] Section 2-548 of the Hartford municipal code provides in relevant part: "(a) The contract for which sealed bids are invited shall be awarded to the lowest responsible bidder. Any person or organization is deemed not to be a responsible bidder that . . .

"(2) Has been found by a court or administrative body of competent jurisdiction to be in violation of the National Labor Relations Act and that such violation continues to exist . . . .

"(c) The city manager shall certify whether the bidder is deemed to be a responsible bidder. If the city manager deems a bidder to meet the city's requirements, the bidder will be certified for a period of one (1) year. In each case, where the city manager determines that a bidder is not deemed to be a responsible bidder, he shall state his reasons in a written opinion to be forwarded to . . . the bidder. . . ."

[4] Laidlaw was the only union shop of the three bidders on the contract.

rary and permanent injunctive relief relating to the contract, monetary damages and equitable relief. At trial, the defendant acknowledged that the plaintiff's bid was the lowest submitted, but it maintained that the plaintiff was not awarded the contract because the defendant had been informed that the plaintiff had a pending labor case with the National Labor Relations Board, and because its bid did not conform to the specifications of the bid request. Terry testified, however, that the plaintiff had 'fully complied with each and every material term of [the] defendant's bid specifications . . . .'

"Thereafter, the trial court held a hearing on the plaintiff's motion for a temporary restraining order. On August 4, 1998, subsequent to the completion of the hearing, but prior to the issuance of the trial court's decision, the defendant executed its contract with Laidlaw. The trial court issued a decision denying the plaintiff's motion for a temporary restraining order on August 7, 1998.

"After a trial on the plaintiff's equal protection and state antitrust claims, the trial court granted the defendant's motion for a directed verdict as to the plaintiff's equal protection claims, and submitted to the jury only the claim alleging an antitrust violation. Ultimately, the jury returned a verdict for the plaintiff in the amount of $500,000 on that claim. The defendant then filed a motion to set aside the verdict. The trial court granted this motion and, thereafter, set aside the verdict for the plaintiff. The trial court reserved the question as to whether Laidlaw was a necessary party on the injunction portion of the claim and noted that it would hold a hearing on the plaintiff's request for permanent injunctive relief ab initio if it were to decide that Laidlaw was indeed a necessary party. The court ultimately determined that Laidlaw was a necessary party and that it should be joined as a party within thirty days of that order. Prior to a resolution of the claim for permanent

injunctive relief, [however] the plaintiff appealed from the judgment of the trial court setting aside the verdict on its antitrust claim."[5] *Cheryl Terry Enterprises, Ltd.* v. *Hartford,* supra, 262 Conn. 243–45.

As we noted previously, we dismissed the plaintiff's first appeal, concluding that the plaintiff had not appealed from a final judgment because the claim for injunctive relief had not been determined. Id., 242. Due to the trial court's subsequent resolution of the plaintiff's remaining claim for injunctive relief, we now address the merits of the plaintiff's claims.

I

We address the plaintiff's first two claims together because they are interrelated. The plaintiff claims that the trial court improperly granted the defendant's motion to set aside the verdict on the ground that *Lawrence Brunoli, Inc.* v. *Branford,* supra, 247 Conn. 407, precludes a plaintiff from pursuing a statutory antitrust claim for damages against a municipality arising out of a municipal bidding process. The defendant contends that the trial court properly found that, under *Lawrence Brunoli, Inc.,* the plaintiff lacked standing to pursue its antitrust claim, and, therefore, that the trial court lacked subject matter jurisdiction. We agree with the plaintiff.

The following additional facts are relevant to our resolution of this claim. Prior to trial, the plaintiff was

---

[5] At the time of the plaintiff's first appeal to this court, Laidlaw had not been joined as a defendant, and, therefore, it was not a party to that appeal. *Cheryl Terry Enterprises, Ltd.* v. *Hartford,* supra, 262 Conn. 241. As we noted previously, however, when the case was reclaimed to the trial list, Laidlaw subsequently was a defendant in the plaintiff's action. In the current appeal, Laidlaw is involved as an appellee only as to the plaintiff's final claim—whether the trial court properly denied the plaintiff's request for injunctive relief. In conformity with our prior opinion, therefore, we will continue to refer to the city of Hartford as the defendant, and we refer to Laidlaw by name in part IV of this opinion, which addresses the plaintiff's final claim.

warned by the trial court that it would allow the antitrust claim to go to the jury because the court was unprepared to rule on its ultimate viability, but that the court would "closely examine that issue if the jury were to return a verdict in the plaintiff's favor." Ultimately, the jury did return a verdict in the plaintiff's favor, and awarded the plaintiff $500,000 in damages. The defendant filed a motion to set aside the verdict, claiming, inter alia, that the court lacked subject matter jurisdiction to award damages on the antitrust claim.[6] The trial court agreed, and granted the defendant's motion to set aside the verdict.

"The trial court's subject matter jurisdiction is a matter of law and, therefore, our review is plenary. If a party is found to lack standing, the court is without subject matter jurisdiction to determine the cause. . . . A determination regarding a trial court's subject matter jurisdiction is a question of law." *Cadle Co.* v. *D'Addario*, 268 Conn. 441, 446, 844 A.2d 836 (2004).

In its memorandum of decision on the defendant's motion to set aside the verdict, the trial court analyzed the act and determined that "it seems clear that a municipality can be sued under [the] act." We agree. The act provides, inter alia, that "[e]very contract, combination, or conspiracy in restraint of any part of trade or commerce is unlawful." General Statutes § 35-26. For pur-

---

[6] The defendant's motion to set aside the verdict also claimed that: (1) there was no evidence submitted upon which a reasonable jury could have concluded that the defendant conspired to restrain trade; and (2) there was no evidence upon which a reasonable jury could have concluded that the plaintiff suffered damages or an antitrust injury. Because the trial court found that it lacked subject matter jurisdiction in the present case, it declined to address the defendant's claim that there was insufficient evidence to support a finding that the defendant had conspired to restrain trade. Therefore, that claim is not before us in the present appeal. The defendant's remaining claim, that there was insufficient evidence to support a finding that the plaintiff had suffered damages for an antitrust injury, is addressed in part II of this opinion.

poses of the act, " '[p]erson' " is defined broadly as "any individual, proprietorship, corporation, limited liability company, firm, partnership, incorporated and unincorporated association, or any other legal or commercial entity . . . ." General Statutes § 35-25 (b). We consistently have stated that a municipality is a legal entity that can sue and be sued. See, e.g., *Murphy* v. *Ives*, 151 Conn. 259, 264, 196 A.2d 596 (1963) ("[t]owns have no sovereign immunity, and are capable of suing and being sued . . . in any action" [internal quotation marks omitted]). Therefore, the plain language of the statutory definition of "person" is broad enough to include municipalities, such as the defendant in the present case.

This broad definition of "person" is then utilized by the legislature to define both who may be liable for anticompetitive behavior, and who has standing to recover damages for such behavior. In regard to standing, General Statutes § 35-35 provides in relevant part that "any person . . . injured in its business or property by any violation of the provisions of this chapter shall recover treble damages, together with a reasonable attorney's fee and costs." See also General Statutes § 35-34 ("any person . . . may sue for injunctive relief, both temporary or permanent, against threatened loss or damage to its property or business by any violation of this chapter").

Conversely, the legislature also has used that same broad definition of "person" to define any individual or entity that may be liable under the act for anticompetitive behavior. See, e.g., General Statutes § 35-38 ("[a]ny . . . person who has been held to have violated any of the provisions of this chapter shall forfeit and pay to the state a civil penalty of not more than two hundred fifty thousand dollars"); General Statutes § 35-39 ("[a] corporation, association, firm, partnership, proprietorship, or any other legal or commercial entity is liable under this chapter for the acts of its . . . agents").

Indeed, the only express limitation on the act's applicability is set forth in General Statutes § 35-31,[7] which contains four classes of exceptions from liability under the act. None of these exceptions is applicable to the facts of the present case. See also *Mazzola* v. *Southern New England Telephone Co.*, 169 Conn. 344, 355, 363 A.2d 170 (1975) ("[§ 35-31] exceptions are to be strictly construed"). Thus, although the legislature has excluded certain organizations and activities from liability under the act, it has not excluded municipalities, or the municipal bidding process, from its provisions.[8]

[7] General Statutes § 35-31 provides: "(a) Nothing contained in this chapter shall be construed to forbid the existence or operation of labor, agricultural, or horticultural organizations instituted for the purpose of mutual help, and not having capital stock and not conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof. Such organizations, or the members thereof, shall not be held or construed to be illegal combinations or conspiracies or monopolies in restraint of trade, under the provisions of this chapter.

"(b) Nothing contained in this chapter shall apply to those activities of any person when said activity is specifically directed or required by a statute of this state, or of the United States.

"(c) Nothing contained in this chapter shall be construed to prevent persons engaged in the production of agricultural products as farmers, planters, dairymen or growers from acting together in associations, corporate or otherwise, with or without capital stock, in collectively processing, preparing for market, handling and marketing in interstate and foreign commerce, such products of persons so engaged. Such associations may have marketing agencies in common; and such associations and their members may make the necessary contracts and agreements to effect such purposes; provided, such associations are operated for the mutual benefit of the members thereof, as such producers, and conform to one or both of the following requirements: (i) That no member of the association is allowed more than one vote because of the amount of stock or membership capital he may own therein, or, (ii) that the association does not pay dividends on stock or membership capital in excess of eight per cent per annum, and, (iii) that the association shall not deal in the products of nonmembers to an amount greater in value than such as are handled by it for members."

[8] "[I]n construing [the act] . . . the courts of this state shall be guided by interpretations given by the federal courts to federal antitrust statutes." General Statutes § 35-44b. We note, therefore, that the federal courts, including the United States Supreme Court, consistently have held that a municipality is a "person" within the federal antitrust statutes. See, e.g., *Lafayette* v.

See *Doucette* v. *Pomes*, 247 Conn. 442, 457, 724 A.2d 481 (1999) ("[u]nless there is evidence to the contrary, statutory itemization indicates that the legislature intended [a] list to be exclusive" [internal quotation marks omitted]). Although the defendant may be correct that there are significant public policy reasons to exclude the municipal bidding process from the act, that is a change that must be made by the legislature, not this court. See *State* v. *Hanson*, 210 Conn. 519, 529, 556 A.2d 1007 (1989) ("It is axiomatic that the court itself cannot rewrite a statute to accomplish a particular result. That is the function of the legislature." [Internal quotation marks omitted.]); see also *State* v. *Luurt-sema*, 262 Conn. 179, 202, 811 A.2d 223 (2002) (rejecting argument imputing temporal requirement to restraint element of kidnapping statute). In sum, we conclude that the trial court properly determined that a municipality can be sued for violations of the act.[9]

Despite having reached this conclusion, however, the trial court granted the defendant's motion to set aside

*Louisiana Power & Light Co.*, 435 U.S. 389, 396, 98 S. Ct. 1123, 55 L. Ed. 2d 364 (1978).

[9] Our resolution of this issue is informed further by our decision in *Westport Taxi Service, Inc.* v. *Westport Transit District*, 235 Conn. 1, 26, 664 A.2d 719 (1995). In that case, the defendant, a transit district established by the town of Westport, provided bus and taxi services in direct competition with the plaintiff. After the plaintiff was forced out of business, it brought an action against the defendant, alleging violations of the act. Id., 11–12. The trial court found that the defendant had engaged in attempted monopolization and actual monopolization in violation of the act, and awarded the plaintiff damages for lost profits, the value of the business, and prejudgment interest. In addition, the trial court awarded the plaintiff treble damages under § 35-35. Id., 12–13. On appeal to this court, the defendant claimed, inter alia, that it was entitled to "governmental immunity applicable to municipalities and their agencies because it is a transit district established by the town of Westport." Id., 26. We declined to review this claim, concluding that the record was insufficient to analyze the defendant's claim properly. Id., 27. Accordingly, we concluded that the trial court properly awarded the plaintiff treble damages for lost profits and the lost value of the business. Id., 45.

the judgment, determining that in light of our decision in *Lawrence Brunoli, Inc.* v. *Branford,* supra, 247 Conn. 416, the act was "effectively repealed" in actions arising from the municipal bidding process because "[t]o allow antitrust damages here would be repugnant to the public benefit purposes of the municipal competitive bidding laws and would not therefore comport with the similar objectives of the antitrust laws to benefit the public, not competitors, and lead to results the legislature could not have intended." We disagree.

To begin with, we already have concluded that the trial court properly determined that the definition of "persons" subject to liability under the act is broad enough to include municipalities. Once the trial court made this determination, it should have denied the defendant's motion to set aside the verdict, and declined to apply the policy reasons set forth in *Lawrence Brunoli, Inc.,* in order to alter the plain language of the act. *State* v. *Hanson,* supra, 210 Conn. 529.

Moreover, *Lawrence Brunoli, Inc.,* readily is distinguishable from the present case. In *Lawrence Brunoli, Inc.,* the plaintiff, an unsuccessful bidder in a municipal bidding contest, alleged impropriety in the contract awarding process and brought a breach of contract action for money damages against the town of Branford. *Lawrence Brunoli, Inc.* v. *Branford,* supra, 247 Conn. 408. Specifically, the plaintiff alleged fraud, corruption or favoritism on the part of the defendant in awarding the contract. Id., 410. The trial court dismissed the action for lack of subject matter jurisdiction on the ground that the plaintiff lacked standing to assert a claim for money damages and was, therefore, limited to an action for injunctive relief. Id. The issue on appeal to this court was "whether the [trial] court [had] subject matter jurisdiction over a claim for damages, rather than for injunctive relief, allegedly resulting from fraud, corruption or favoritism in the award of a contract that

is subject to competitive municipal bidding requirements." Id., 408. We answered that question in the negative, concluding that, "as a matter of law, an unsuccessful bidder to a municipal contract has no standing to assert a cause of action for money damages for failure of the municipality to follow its competitive bidding laws, regardless of whether the plaintiff alleges fraud, corruption or favoritism" in the bidding process. Id., 411. We began our analysis by noting that because the plaintiff only had bid on the contract, and was not awarded the contract, it lacked standing to bring a common-law breach of contract action. Id., 411–12. Accordingly, we concluded that "[i]f an unsuccessful bidder has standing to bring a claim against a municipality . . . such standing must be derived from a source other than its bid submitted in response to an invitation to bid. That source is the municipal bidding statutes themselves."[10] Id., 412. Because the statutes expressly did not confer standing for money damages, and our prior case law had limited relief in such actions to injunctive relief, we considered whether the policy considerations underlying the bidding statutes were best served by continuing to limit the remedy to injunctive relief. Id., 412–16. We concluded that they were, and, accordingly, affirmed the judgment of the trial court. Id., 416.

Our decision in *Lawrence Brunoli, Inc.*, was limited to actions based on common-law breach of contract claims or the municipal bidding statutes. In the present case, the plaintiff did not assert a common-law breach of contract action, nor an action for injunctive relief

---

[10] See, e.g., *Blesso Fire Systems, Inc.* v. *Eastern Connecticut State University*, 245 Conn. 252, 254–55, 713 A.2d 1283 (1998); *Unisys Corp.* v. *Dept. of Labor*, 220 Conn. 689, 693–95, 600 A.2d 1019 (1991); *Ardmare Construction Co.* v. *Freedman*, 191 Conn. 497, 501, 467 A.2d 674 (1983); *Spiniello Construction Co.* v. *Manchester*, 189 Conn. 539, 543–44, 456 A.2d 1199 (1983); *John J. Brennan Construction Corp., Inc.* v. *Shelton*, 187 Conn. 695, 702, 448 A.2d 180 (1982); *Austin* v. *Housing Authority*, 143 Conn. 338, 349, 122 A.2d 399 (1956).

under the municipal bidding statutes, but, rather, sought relief under the act. We simply were not called upon in *Lawrence Brunoli, Inc.*, to address whether an unsuccessful lowest bidder had standing to bring an action under the act. Furthermore, as we stated in that case, "[i]f an unsuccessful bidder has standing to bring a claim against a municipality . . . such standing must be derived from a source other than its bid submitted in response to the invitation to bid." Id., 412. As we noted previously, the legislature expressly has conferred standing on a broad range of individuals under the act, including unsuccessful bidders in a municipal bidding process. Thus, an independent source of standing, which was absent in *Lawrence Brunoli, Inc.*, exists in the present case. Put another way, in *Lawrence Brunoli, Inc.*, we were attempting to discern whether, in the absence of a direct conferral of standing by the legislature in the municipal bidding statutes, this court should recognize a right to standing for money damages. See id., 412–16. To the contrary, in the present case the legislature has conferred standing to a broad class of persons that includes a municipality, and this court cannot now limit that standing in a manner contrary to the plain language of the act.

Finally, we note that the policy considerations supporting our decision in *Lawrence Brunoli, Inc.*, are rendered inapplicable to the present case due to the legislature's broad conferral of standing under the act, which is based on several important principles, including, the protection of the public from anticompetitive behavior and the promotion of competition in the marketplace. See, e.g., *Shea* v. *First Federal Savings & Loan Assn. of New Haven*, 184 Conn. 285, 294, 439 A.2d 997 (1981) ("[b]oth federal and Connecticut antitrust law attempt to promote competition in the marketplace"). Put another way, although this court was hesitant to expose taxpayers to the additional costs of

money damages in *Lawrence Brunoli, Inc.*, the legislature has not expressed a similar hesitation within the language of the act. Indeed, as the plaintiff correctly contends, it would be incongruous to allow a municipality to bring an action against contractors under the act for anticompetitive behavior, yet preclude those same contractors from bringing an action against a municipality that has engaged in anticompetitive behavior.[11] The trial court's reliance on *Lawrence Brunoli, Inc.*, therefore, was misplaced.

## II

We turn next to the plaintiff's claim that the trial court improperly granted the defendant's motion to set aside the verdict on the ground that the plaintiff had failed to prove its claim of lost profits to a reasonable degree of certainty. The defendant contends that the trial court properly determined that the plaintiff had introduced no evidence of lost profits. We agree with the plaintiff.

The following additional facts and procedural history are relevant to our resolution of this claim. At trial, the evidence concerning the plaintiff's lost profits consisted of the bid on the Hartford school transportation contract (bid) and the testimony of Terry, the plaintiff's president. The bid was for a five year contract, with busing services to commence on July 1, 1998, and to terminate on June 30, 2003. On the bid forms, bidders had to specify the price of five items for each of the five years. Specifically, the bid forms requested prices for three "runs" consisting of morning, midday and afternoon service, whereby bidders had to specify the

---

[11] We note that the defendant's anticompetitive behavior in the present case resulted in a greater cost to taxpayers for the contract, not less. Although awarding damages to the plaintiff, the injured party, may exacerbate the additional costs paid by the taxpayers, thus bolstering the defendant's policy argument for exempting the municipal bidding process from the act, any change to the act must come from the legislature, not this court.

annual unit price per school bus, and then multiply that price by the number of buses to arrive at an annual price per run.[12] The bid forms also requested an annual price for 180 half hours of "additional service." Finally, the bid forms requested the annual price of bus monitors, to be calculated by multiplying a monitor's hourly salary by 15,120 hours. Each of these prices were added together to arrive at the total annual price of the busing service. The bidder was then required to add together the annual prices for each of the five years, adjusted for present value, to arrive at the net present value, or total price, of the bid.

The net present value of the plaintiff's bid was $5,862,997.93. Terry testified that this figure included all of the plaintiff's costs, as well as its usual anticipated profit of 8 to 10 percent. Specifically, Terry testified that, in preparing the bid, she had calculated the following costs: the cost of purchasing new or used school buses, including the cost of financing those purchases; payroll, including taxes and workers' compensation insurance; facility costs, including the cost of gasoline for the school buses; property costs; and the cost of liability insurance. Terry further testified that she had calculated each of these costs on the basis of the individual specifications of the bid. She then testified that, after calculating the plaintiff's costs, she had added its anticipated profit. Terry stated that her usual practice was to add between 8 and 10 percent profit to her bids.

In addition, Terry testified at length concerning her approximately thirty years of experience in the school transportation business. She stated that she had started as a school bus driver in the 1960s, and soon thereafter

[12] With regard to morning, midday and afternoon service, the bid form requested prices for the following specifications: thirty-four school buses for morning service, running from 6:30 a.m. to 9:15 a.m.; one school bus for midday service, running from 10:30 a.m. to 12 p.m.; and thirty-four school buses for afternoon service, running from 2 p.m. to 5 p.m.

was managing school transportation contracts for a number of cities and towns throughout the state, encompassing "well over 200" school buses at one time and "[forty-eight school buses] in Norwich alone." In 1984, Terry incorporated the plaintiff, which has provided school transportation services since that time.

On cross-examination by the defendant, Terry acknowledged that she was unable to produce the exact figures that she had used in calculating the bid. She stated, however, that, although she had prepared the bid two and one-half years before the trial and could not remember the actual figures she had used, she could explain how she had calculated the bid. Terry explained that she had calculated the bid the same way that she calculates all of her bids: "I took my costs, as I always do, and add[ed] a profit, and that is all I can tell you because that is the way you do it." Although Terry acknowledged that it was "possible" that she could have miscalculated the bid, she stated: "I have been doing this for a long time, and I have been pretty much on target. . . . I am not infallible, no one is infallible, but I have a record." When the defendant's attorney asked Terry, a second time, if she could have miscalculated her expenses, she replied: "I have a record, that is why I am in business. . . . I am confident of my past experience which has been many many years in the business, or I wouldn't have been in the business."

At the end of Terry's testimony, the defendant moved to strike her testimony concerning anticipated profits as irrelevant because "she does not have the knowledge upon which to base an estimate of the profits." The trial court denied the motion to strike, but indicated that, "unless there is more offered in the way of facts and figures that [Terry] relied on, I may be in a position

where I grant a motion for a directed verdict . . . ."[13] The plaintiff presented no further evidence concerning Terry's preparation of the bid or the plaintiff's anticipated profits.

The jury returned a verdict in favor of the plaintiff on its antitrust claim, and awarded damages in the amount of $500,000.[14] The defendant thereafter filed a motion to set aside the verdict, claiming, inter alia, that "[t]he verdict bears no relationship to [the] damages proved in the case." The trial court agreed, and concluded that the plaintiff had "fail[ed] to prove damages to a reasonable certainty [and] that the jury verdict was based on sheer speculation." Specifically, the court stated that, "the plaintiff, through . . . Terry, presented no experts, statistics, financial records as to costs or any information from which a reasonable calculation of lost profits could be made for this contract. [Terry] simply testified that she had been in the school

---

[13] In denying the defendant's motion to strike Terry's testimony as irrelevant, the trial court stated: "My difficulty now is in [granting] a motion to strike if the trial isn't over, so I can't say that the testimony is not relevant, you know, as such. But I am telling you, counsel, in fairness to you, that unless it is tied up, I am going to have a problem, because one of the aspects of this case is a request for an injunction, and the other aspect of this case is a request for damages. . . . The law permits speculation, but in certain respects on future earnings, and the cases are pretty liberal. Like a claim for future earnings, but there has to be some foundational requirement. And [Terry] didn't remember any costs of this contract, she didn't remember maintenance, facilities, she had no access to these figures. And yet she says that she relies on these figures in determining what her bid price was and what her rate of profit is. . . . I can't say that her testimony was completely irrelevant, but I am telling you, counsel, unless there is more offered in the way of facts and figures that [Terry] relied on, I may be in a position where I grant a motion for a directed verdict . . . . And in fairness to you, I will allow you to recall her if she has figures."

[14] Approximately 8.5 percent of the net present value of $5,862,997.93, the plaintiff's bid on the Hartford school transportation contract, amounted to approximately $500,000, the amount awarded the plaintiff. Terry's estimated profit of between 8 and 10 percent of the net present value represents a profit between $469,039.83 and $586,299.79. Accordingly, the jury's damage award falls within this range.

transportation business for thirty years and her rate of profit was between 8 and 10 percent. . . . Terry was a very candid witness . . . [and] repeatedly said that she had done the calculation on cost for this bid over two years ago and did not have her records nor any present memory of any of the cost items that went into determining the expenses of completing the contractual obligations she was bidding for . . . . In the court's opinion, that will not do. Profits are determined by subtracting expenses from anticipated revenue. Although expenses for a five year contract cannot be calculated precisely in every category, some credible and concrete figures must be provided—[Terry] admitted at one time she had those very figures, she just did not bring them to court or no longer had them." The trial court further stated that, even if the plaintiff could have established lost profits "by proving the amount of the bid and the rate of profit it traditionally received by running this business for over thirty years," there was "no evidence that the school transportation contracts it had performed in the past were anything comparable to the prospective Hartford five year contract." Consequently, the trial court granted the defendant's motion to set aside the jury's verdict.

We begin with a brief discussion of the appropriate standard of review. "The trial court possesses inherent power to set aside a jury verdict which, in the court's opinion, is against the law or the evidence. . . . The supervision which a judge has over the verdict is an essential part of the jury system. . . . [The trial court] should not set aside a verdict where it is apparent that there was some evidence upon which the jury might reasonably reach their conclusion, and should not refuse to set it aside where the manifest injustice of the verdict is so plain and palpable as clearly to denote that some mistake was made by the jury in the application of legal principles, or as to justify the suspicion

that they or some of them were influenced by prejudice, corruption or partiality. . . . The court has a duty to set aside the verdict where the jury's action is so unreasonable as to suggest that it was the product of such improper influences. . . .

"We recognize that, [i]n determining whether to set aside the verdict, the trial court walks a thin line. . . . Ultimately, [t]he decision to set aside a verdict entails the exercise of a broad legal discretion . . . that, in the absence of clear abuse, we shall not disturb. Our review of the trial court's action on a motion to set aside the verdict involves a determination of whether the trial court abused its discretion, according great weight to the action of the trial court and indulging every reasonable presumption in favor of its correctness . . . since the trial judge has had the same opportunity as the jury to view the witnesses, to assess their credibility and to determine the weight that should be given to their evidence. . . . Moreover, the trial judge can gauge the tenor of the trial, as we, on the written record, cannot, and can detect those factors, if any, that could improperly have influenced the jury. . . .

"Finally, in evaluating the exercise of the trial court's discretion, we are mindful that litigants have a constitutional right to have juries decide issues of fact. The right to a jury trial is fundamental in our judicial system, and this court has said that the right is one obviously immovable limitation on the legal discretion of the court to set aside a verdict, since the constitutional right of trial by jury includes the right to have issues of fact as to which there is room for a reasonable difference of opinion among fair-minded men passed upon by the jury and not by the court. . . . Since, in setting aside the verdict, the trial court has deprived the party in whose favor the verdict was rendered of his constitutional right to have factual issues resolved by the jury, we must examine the evidential basis of the verdict

itself to determine whether the trial court abused its discretion." (Citations omitted; internal quotation marks omitted.) *Howard* v. *MacDonald*, 270 Conn. 111, 126–28, 851 A.2d 1142 (2004).

In the present case, the trial court set aside the jury's verdict because it concluded that the plaintiff had not proved its damages to a reasonable certainty. "The amount of a damage award is a matter peculiarly within the province of the trier of fact, in this case, the jury. . . . In considering a motion to set aside the verdict, the [trial] court must determine whether the evidence, viewed in the light most favorable to the prevailing party, reasonably supports the jury's verdict." (Internal quotation marks omitted.) *Carrol* v. *Allstate Ins. Co.*, 262 Conn. 433, 449, 815 A.2d 119 (2003). Accordingly, we must determine whether the trial court abused its discretion in making its determination that the evidence reasonably did not support the jury's award of damages.

"In deciding whether damages properly have been awarded . . . we are guided by the well established principle that such damages must be proved with reasonable certainty. . . . Although we recognize that damages for lost profits may be difficult to prove with exactitude . . . such damages are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount with reasonable certainty. . . . Consequently, we have permitted lost profits to be calculated by extrapolating from past profits." (Citations omitted; internal quotation marks omitted.) *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, 247 Conn. 48, 69, 717 A.2d 724 (1998).

"This court and courts of other jurisdictions have looked to a number of factors in evaluating whether the plaintiff has proved lost profits to a reasonable certainty. A plaintiff's prior experience in the same business has been held to be probative . . . as has a plain-

tiff's experience in the same enterprise subsequent to the interference. . . . [T]he experience of the plaintiff . . . in a similar business [has] been admitted to prove lost profits. . . . In addition, the average experience of participants in the same line of business as the injured party has been approved as a method of proving lost profits. . . . Similarly, prelitigation projections, particularly when prepared by the defendant, have also been approved. . . . The underlying requirement for each of these types of evidence is a substantial similarity between the facts forming the basis of the profit projections and the business opportunity that was destroyed." (Citations omitted.) Id., 72–74.

Finally, this court has recognized that, "[t]he vagaries of the marketplace usually deny us sure knowledge of what [the] plaintiff's situation would have been in the absence of the defendant's antitrust violation. This fact and the general belief that it would be inequitable to allow a wrongdoer to defeat recovery by insisting on rigorous proof of damages have resulted in a lesser burden of proving the amount of damages in antitrust suits than in other contexts." (Internal quotation marks omitted.) *Westport Taxi Service, Inc.* v. *Westport Transit District,* 235 Conn. 1, 28, 664 A.2d 719 (1995), quoting 1 A.B.A. Antitrust Section, Antitrust Law Developments (3d Ed. 1992) p. 668. Accordingly, "[a] damage theory may be based on assumptions so long as the assumptions are reasonable in light of the record evidence. . . . The reasonableness of the assumptions underlying the plaintiff's damage theory is determined by the trier of fact. . . . Federal appellate courts have refused to find damage evidence insufficient unless there was *no basis* for critical assumptions made by the [trier of fact]." (Citations omitted; emphasis added; internal quotation marks omitted.) *Westport Taxi Service, Inc.* v. *Westport Transit District,* supra, 28.

Our review of the record reveals that the jury's award of damages was reasonably supported by the evidence, which proved those damages to a reasonable certainty. First, the plaintiff's bid on the Hartford school transportation contract stated a net present value of $5,862,997.93. This figure reflects the net present value of the requested three daily runs of school bus service, additional service and bus monitors over the course of five years. On the basis of this evidence and any assumptions reasonably drawn therefrom, the jury reasonably could have concluded that, in the absence of the defendant's antitrust violation, the plaintiff would have performed the Hartford school transportation contract at a price of $5,862,997.93.

Second, Terry testified at length concerning her substantial experience in preparing bids for school transportation contracts. Specifically, Terry testified that she had approximately thirty years of experience in preparing such bids, and that she had run her own school transportation company since 1984. She also stated, several times, that she prepared her bids by first calculating her costs, and then adding in an anticipated profit, which was usually between 8 and 10 percent of the price of the bid. Although Terry could not produce the exact figures she had used in calculating the costs for the bid, she discussed, in detail, the nature of those costs. On cross-examination, Terry candidly acknowledged the possibility that she could have miscalculated the bid. She stated, however, that "I have been doing this for a long time, and I have been pretty much on target." Terry also stated: "I am confident of my past experience which has been many many years in the business, or I wouldn't have been in the business." On the basis of this testimony, the jury reasonably could have inferred that Terry accurately had predicted the plaintiff's profits on previous bids. Moreover, her testimony was consistent with our well settled principle

that "the owner of property is competent to testify to its value. . . . Furthermore, we have determined that a franchise owner is competent to testify as to the value of a franchise. . . . This is based in part on the common experience that an owner is familiar with her property . . . . The weight to be accorded such testimony is for the trier to decide." (Citations omitted; internal quotation marks omitted.) *Westport Taxi Service, Inc.* v. *Westport Transit District*, supra, 235 Conn. 35.

In *Westport Taxi Service, Inc.* v. *Westport Transit District*, supra, 235 Conn. 32–36, in which the plaintiff had alleged antitrust violations, this court upheld an award of damages for lost profits and lost business value. In that case, the plaintiff, a private taxi company, claimed that the defendant municipality had committed an antitrust violation by operating a government subsidized, below cost taxi service for the purpose of monopolizing the town's taxi business, thereby forcing the plaintiff out of business. After a court trial, the trial court agreed with the plaintiff and awarded it damages for lost profits and lost business value. With regard to lost profits, the trial court found that the plaintiff had not sought a fare increase with the state public utilities commission, because it "legitimately [had] feared that it would have trouble enough competing with [the defendant's] service at present rates, without adding to the problem by increasing its fares." (Internal quotation marks omitted.) Id., 30. Accordingly, the court awarded damages of $12,144 in lost profits based upon the difference in what the plaintiff had been charging and what it could have charged but for the defendant's conduct.[15] Id., 30–32.

---

[15] The plaintiff had been charging a fare of $1.80 for an average three mile trip, whereas taxi companies in the surrounding areas of Bridgeport, Greenwich and Stamford had been charging $2.70 for the same distance. The trial court therefore awarded lost profits on the basis of the difference between the $1.80 average fare that the plaintiff had been charging and the $2.70 average fare that it could have charged. *Westport Taxi Service, Inc.* v. *Westport Transit District*, supra, 235 Conn. 30–31.

The trial court in *Westport Taxi Service, Inc.*, then determined that the plaintiff also was entitled to $150,000 in damages for lost business value. In arriving at this figure, the trial court noted its reliance on the testimony of the plaintiff's vice president, who stated that a fair return on a taxi business would be between 10 and 12 percent. Specifically, "[t]he trial court determined that [the witness'] valuation of the business was based on his own experience in the taxi business for more than twenty years, his knowledge of how a taxi business was valued by the industry, his discussions with other owners, his knowledge of other sales, his membership in the Connecticut Taxi Cab Association, his membership in the International Taxi Cab Association, and finally, his own personal experience and practice . . . ." (Internal quotation marks omitted.) Id., 34. In accordance with the testimony of the plaintiff's vice president, the trial court applied a 10 to 12 percent rate of return to its own calculation of the plaintiff's projected profits to arrive at its ultimate determination in lost business value. Id., 33.

The defendant appealed to this court, which affirmed the award of damages for lost profits and lost business value. Id., 45. With respect to lost profits, this court concluded that "the trial court based its calculation of the plaintiff's damages due to lost profits on sufficient evidence and reasonable assumptions . . . ." Id., 32. In addition, this court concluded that the trial court properly had relied on the testimony of the plaintiff's vice president to establish the lost value of the plaintiff's business. In so concluding, we noted "that the trial court has broad discretion to admit the testimony of anyone who is involved with a business or property and may have personal knowledge of its value." Id., 35. Because the plaintiff's vice president was competent to testify to the methods he had employed in valuing the business, the weight given his testimony was for

the trial court, as the trier of fact, to decide. Id. Just as the plaintiff's vice president in *Westport Taxi Service, Inc.*, was competent to testify as to the plaintiff's lost anticipated profits and to his reliance on those figures in valuing his business, Terry was competent to testify in the present case as to the methods she had used in predicting a profit in the plaintiff's bid for the Hartford school transportation contract, and, therefore, the jury was entitled to credit her testimony as it did.[16] See *Capitol City Personnel Services, Inc.* v. *Franklin*, 52 Conn. App. 783, 787, 727 A.2d 1284 (1999) (plaintiff proved damages with reasonable certainty when principal shareholder estimated profits as 25 percent of adjusted gross receipts, and testified that 25 percent was "accurate" for both industry and this particular plaintiff).[17]

---

[16] We note, in addition, that our observation in *Westport Taxi Service, Inc.* v. *Westport Transit District*, supra, 235 Conn. 29, that the trial court in that case had "made meticulous findings of fact and clearly detailed its calculations" regarding the plaintiff's lost profits, does not lessen the applicability of that case to our resolution of this issue in the present case. This detail was the result of the fact that *Westport Taxi Service, Inc.*, was tried to the court, which has the ability, and indeed the obligation, to provide such findings. See Practice Book § 6-1 (a).

[17] The defendant attempts to distinguish the present case from *Capitol City Personnel Services, Inc.* v. *Franklin*, supra, 52 Conn. App. 787, because in that case, "the plaintiff's witness testified that [the] plaintiff had earned a 25 percent profit markup on its billings for the same type of business in the same locality over the past three years. [The] [p]laintiff also presented testimony that other businesses in the same industry and area also earned about the same percentage profit at the time." This is a distinction without a difference. In the present case, Terry testified that she always anticipates a profit of between 8 and 10 percent, and that she usually is accurate. Therefore, Terry's estimate of lost profits was not a "pure guess [that] was wholly unsupported as to either the amount of business lost or the profit to be expected." *Doeltz* v. *Longshore, Inc.*, 126 Conn. 597, 602, 13 A.2d 505 (1940). Moreover, the fact that the plaintiff had submitted the lowest bid on the Hartford school transportation contract, is evidence that the plaintiff's bid was competitive in the industry. Therefore, the jury reasonably could have inferred that Terry's stated anticipated profit of 8 to 10 percent was accurate as to the state's school transportation industry, as well as to this particular plaintiff. Finally, the fact that the plaintiff's anticipated profit had ranged from 8 to 10 percent is not fatal to its claim for lost profits; that

Moreover, in *Bead Chain Mfg. Co.* v. *Saxton Products, Inc.*, 183 Conn. 266, 439 A.2d 314 (1981), this court concluded that, under the Uniform Commercial Code; General Statutes § 42a-1-101 et seq.; lost profits on a breached contract for the sale of goods may be established through the opinion testimony of the seller. Specifically, this court stated: "With regard to the loss of profits, [the plaintiff's] president testified, without objection, about the elements he considered in pricing the job for [the defendant]. Under the [Uniform Commercial] Code, it is not fatal that his cost and price estimates about the actual production run were necessarily theoretical, since [the defendant's] breach made it impossible to go forward with the production that would have made historically accurate figures available. . . . [The plaintiff's] president based his estimates on his experienced view of the equipment that would be required, the difficulty of maintaining production, and the time required for the job. Having taken account of these and related factors, he built a 20 percent profit into the contract price of $13.95 per thousand units. The award of $3000 lost profits on a contract for

range of anticipated profit was sufficiently restrictive to permit the jury to determine the damages with reasonable certainty. See *Westport Taxi Service, Inc.* v. *Westport Transit District*, supra, 235 Conn. 33–34 (trial court's reliance on fair rate of return of between 10 to 12 percent in valuing plaintiff's business was proper).

Similarly, the dissent's reliance on *Doeltz* is misplaced. In that case, this court determined that lost profits had been improperly awarded for the plaintiff's new business when profits had actually increased after the defendant's interference and the plaintiff had presented no evidence of costs other than rent. *Doeltz* v. *Longshore, Inc.*, supra, 126 Conn. 601. In addition, the plaintiff's testimony that "[w]e usually figure on the liquor 100 [percent profit] and food 50 [percent profit]"; id., 599; in an attempt to establish lost profits was deficient. Id., 601. This court concluded in *Doeltz* that, without more evidence, simply averaging the two figures to arrive at a claim for 75 percent lost profit, was insufficient, because "[n]o attempt was made to show what relative proportion of [the plaintiff's] total sales fell within one class or the other. The evidence quoted shows that the estimate of the plaintiff was a pure guess and was wholly unsupported as to either the amount of business lost or the profit to be expected." Id., 601–602.

5,000,000 units at a total contract price of approximately $70,000 was therefore well within the supporting evidence." (Citations omitted.) *Bead Chain Mfg. Co.* v. *Saxton Products, Inc.*, supra, 279–80. Although *Bead Chain Mfg. Co.* was decided under the Uniform Commercial Code, "[w]e have often drawn upon provisions of the Uniform Commercial Code as a source of analogy for the emergent common law." *Normand Josef Enterprises, Inc.* v. *Connecticut National Bank*, 230 Conn. 486, 501, 646 A.2d 1289 (1994). Therefore, as in *Bead Chain Mfg. Co.*, it is not fatal in the present case that Terry's estimated profits under the Hartford school transportation contract were necessarily theoretical, since it was the defendant's antitrust violation, in the first instance, that rendered the historically accurate figures unavailable.

The defendant, relying on *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, supra, 247 Conn. 70, and *Gordon* v. *Indusco Management Corp.*, 164 Conn. 262, 320 A.2d 811 (1973), contends that this court previously has set aside damage awards that were "supported by far more evidence than the verdict here." A review of those cases, however, reveals that they do not support the defendant's characterization. In *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, supra, 50–52, the plaintiff, a corporation that sold exercise equipment, brought an action against the defendant law firm and certain individual attorneys for malpractice in connection with the plaintiff's failed attempt to establish a new business that would franchise fitness clubs. After a court trial, the trial court rendered a verdict for the plaintiff, and awarded the plaintiff approximately $15.9 million in lost profits. Id., 51. On appeal, this court reversed the damages award, because "the trial court improperly concluded that the plaintiff had established its damages to a reasonable certainty." Id., 59. Specifically, the plaintiff in that case

had not sold any fitness franchises; id., 72; therefore, there was no record of such sales from which to extrapolate anticipated future profits. Accordingly, the plaintiff attempted to establish lost profits through the expert testimony of a certified public accountant, who estimated the plaintiff's lost profits on the basis of its prior sales of fitness equipment. Id., 70–72. As this court noted, however, this testimony was based on the faulty assumption that, because the plaintiff previously had sold fitness *equipment*, it would have been able to sell fitness *franchises* with a similar rate of success. Id.

The lost profits of a new business also was an issue in *Gordon* v. *Indusco Management Corp.*, supra, 164 Conn. 262, the other case relied on by the defendant. In *Gordon*, the plaintiff, who had acquired an area distributorship franchise in a fast-food restaurant operation, entered into a contract with the defendant for the construction and lease of a building in Danbury in which the plaintiff would operate an outlet of the restaurant chain. Id., 264. After the defendant had failed to construct the outlet, as it had promised to in the contract, the plaintiff brought an action against the defendant for breach of contract. Id., 263. In an effort to establish lost profits, the plaintiff presented the testimony of the operator an outlet of the fast-food chain located in Orange. That witness testified that his outlet's gross receipts were $175,000, and that his net profit was 12 percent of the gross receipts. Id., 275. As this court noted, however, the operator of the outlet in Orange had managed that outlet himself, and his stated figure of a 12 percent profit had *included* the value of his own services to the operation in that capacity. Id., 276. The plaintiff, by contrast, had intended to hire a manager to run his outlet for him. Id. Accordingly, the court in *Gordon* concluded that the plaintiff had not proved his damages, because, "[s]ince the plaintiff would not have given his services but would have employed a manager

for his outlet, it is not clear that he would have enjoyed a similar profit margin." Id.

Unlike the businesses in both *Beverly Hills Concepts, Inc.*, and *Gordon*, the plaintiff in the present case is not a new business.[18] As we previously have stated, Terry testified that she had approximately thirty years of experience in the school transportation industry and had been running her own school transportation company since 1984. She also testified that, prior to incorporating her own company, she had managed a school transportation company that had "well over 200" school buses and "[forty-eight school buses] in Norwich alone." The bid form in the present case indicates that only thirty-four school buses would have been required for performance of the Hartford school transportation contract. See footnote 12 of this opinion. Finally, Terry discussed the specific types of expenses that she had considered in preparing the bid, and she testified that she always had prepared her bids by first calculating the costs, and then adding in the anticipated profit. Accordingly, Terry's testimony established that she previously had managed school transportation contracts that were similar to the contract at issue in the present case, and on the basis of this testimony, the jury reasonably could have concluded that Terry's anticipated profit of between 8 and 10 percent was appropriate. Because the jury's damage award of $500,000, or approximately 8.5 percent in lost profits, was well within this range; see footnote 14 of this opinion; the trial court abused its discretion in setting aside the jury's verdict.

---

[18] In addition, we note that neither *Beverly Hills Concepts, Inc.*, nor *Gordon* were antitrust cases and, accordingly, both can be distinguished on that ground alone. See *Westport Taxi Service, Inc.* v. *Westport Transit District*, supra, 235 Conn. 28 (there is "a lesser burden of proving the amount of damages in antitrust suits than in other contexts" [internal quotation marks omitted]); see also *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, supra, 247 Conn. 92 (*Peters, J.*, dissenting).

## III

The plaintiff next claims that the trial court improperly granted the defendant's motion for a directed verdict on its equal protection claims on the ground that the plaintiff had an adequate remedy at law in its antitrust claim, because the trial court subsequently deprived the plaintiff of that adequate remedy when it set aside the jury's verdict on the antitrust claim. The defendant contends that the trial court properly directed the verdict on the plaintiff's constitutional claims because the plaintiff had the remedy of a permanent injunction available to her. Because we have concluded that the trial court's judgment setting aside the verdict was improper, we need not decide this issue because a litigant may recover just damages only once.[19]

## IV

The plaintiff's final claim is that the trial court improperly failed to grant it a mandatory injunction requiring that the defendant enter into a prospective, five year contract with the plaintiff on a cost plus 10 percent profit basis.[20] The defendant contends that the trial

[19] "The rule precluding double recovery is a simple and time-honored maxim that [a] plaintiff may be compensated only once for his just damages for the same injury. . . . Plaintiffs are not foreclosed from suing multiple defendants, either jointly or separately, for injuries for which each is liable, nor are they foreclosed from obtaining multiple judgments against joint tortfeasors. . . . The possible rendition of multiple judgments does not, however, defeat the proposition that a litigant may recover just damages only once. . . . Double recovery is foreclosed by the rule that only one satisfaction may be obtained for a loss that is the subject of two or more judgments." (Internal quotation marks omitted.) *Haynes* v. *Yale-New Haven Hospital*, 243 Conn. 17, 22 n.6, 699 A.2d 964 (1997).

[20] In its complaint, the plaintiff also sought prohibitory injunctive relief, namely, that the court temporarily restrain the defendant from entering into the contract with another party, and temporarily restrain the defendant from permitting any party to perform work under the contract. The plaintiff concedes that, because the contract was in fact almost complete at the time of the hearing, its request for prohibitory injunctive relief was moot and nonjusticable. Consequently, we will address only the trial court's denial of the plaintiff's request for prospective mandatory relief. See *Tomasso Bros.*,

court was within its discretion to deny the relief requested by the plaintiff. Laidlaw[21] claims that, because the 1998 contract has terminated, and it already is performing work under a new five year contract awarded in 2003, issuance of the mandatory injunctive relief sought by the plaintiff would severely harm Laidlaw. We agree with the defendant.

"A mandatory injunction . . . is a court order commanding a party to perform an act." *Tomasso Bros., Inc.* v. *October Twenty-Four, Inc.*, 230 Conn. 641, 652, 646 A.2d 133 (1994). "Relief by way of mandatory injunction is an extraordinary remedy granted in the sound discretion of the court and only under compelling circumstances. . . . Ordinarily, an injunction will not lie where there is an adequate remedy at law." (Citation omitted; internal quotation marks omitted.) *Monroe* v. *Middlebury Conservation Commission*, 187 Conn. 476, 480, 447 A.2d 1 (1982); accord *Harvey* v. *Daddona*, 29 Conn. App. 369, 377, 615 A.2d 177 (1992) ("[i]njunctions should not be issued when damages can adequately protect the injured party"). Moreover, "[w]here the granting of the injunction would cause damage to the defendant greatly disproportionate to the injury of which the plaintiff complains, it may be held inequitable to grant a mandatory injunction and the plaintiff may be remitted to her remedy by way of damages." *Moore* v. *Serafin*, 163 Conn. 1, 6–7, 301 A.2d 238 (1972). In sum, "[m]andatory injunctions are . . . disfavored as a harsh remedy and are used only with caution and in compelling circumstances." 42 Am. Jur. 2d 560, Injunctions § 5 (2000).

We conclude that the trial court properly determined that the present case failed to present the " 'compelling

*Inc.* v. *October Twenty-Four, Inc.*, 230 Conn. 641, 652, 646 A.2d 133 (1994) (distinguishing prohibitory injunctions from mandatory injunctions).

[21] Laidlaw is involved as an appellee solely for this claim. See footnote 5 of this opinion.

circumstances' " required for the issuance of a mandatory injunction. *Monroe* v. *Middlebury Conservation Commission*, supra, 187 Conn. 480. The plaintiff had an adequate remedy under the act, namely, an action for damages against the defendant, on which she prevailed. Moreover, even if the plaintiff had not had the ability to collect damages, we would conclude that the trial court properly exercised its discretion in denying the relief requested. See id. ("mandatory injunction is an extraordinary remedy granted in the sound discretion of the court" [internal quotation marks omitted]). The plaintiff was requesting that the trial court award a new contract to the plaintiff, for a term of five years, and for a total value of cost plus a *guaranteed profit* of 10 percent. The plaintiff has failed to cite, before both the trial court and this court, any authority for such a broad use of the extraordinary remedy of a mandatory injunction. Indeed, the contract underlying the present case has expired, and the defendant already has entered into a new five year contract with Laidlaw. Thus, if that contract, which is not challenged in the present case, remained in effect, and the plaintiff's request for a new contract was granted, the result would be that two contracts would be in effect for the same project.[22] This court previously has rejected such a bizarre result. See *Blesso Fire Systems, Inc.* v. *Eastern Connecticut State University*, 245 Conn. 252, 257, 713 A.2d 1283 (1998). Consequently, we conclude that the trial court did not abuse its discretion in denying the plaintiff's request for a mandatory injunction.

The judgment is reversed in part and the case is remanded with direction to reinstate the judgment for the plaintiff in accordance with the jury's verdict.

---

[22] Such a remedy also would create an expansive range of practical problems for the trial court when developing, and subsequently monitoring, the new contract, including: how would cost be determined; what services would be covered under the contract; how would changes resulting from changed market conditions be addressed; and how would the level of service provided by the plaintiff be measured.

In this opinion SULLIVAN, C. J., and BORDEN, PALMER and ZARELLA, Js., concurred.

NORCOTT, J., with whom VERTEFEUILLE, J., joins, concurring and dissenting. I concur with the outcome in parts I, III and IV of the thoughtful majority opinion.[1] I disagree with the majority's conclusion in part II, however, and respectfully dissent. More specifically, I would conclude that the trial court properly set aside the jury's verdict on the antitrust claim of the plaintiff, Cheryl Terry Enterprises, Ltd., on the ground that the plaintiff had failed to present sufficient proof of damages.

Without reiterating the entire standard of review, I nonetheless note that I agree with the majority that a trial court's decision to set aside a verdict is entitled to " 'broad legal discretion,' " and, therefore, our review of " 'the trial court's action on a motion to set aside the verdict involves a determination of whether the trial court abused its discretion, according great weight to the action of the trial court and indulging every reasonable presumption in favor of its correctness' . . . ." (Citations omitted.) *Howard* v. *MacDonald*, 270 Conn. 111, 127, 851 A.2d 1142 (2004); accord *Labbe* v. *Pension Commission*, 239 Conn. 168, 192, 682 A.2d 490 (1996); *Ginsberg* v. *Fusaro*, 225 Conn. 420, 425, 623 A.2d 1014 (1993); *Palomba* v. *Gray*, 208 Conn. 21, 24, 543 A.2d 1331 (1988); *O'Brien* v. *Seyer*, 183 Conn. 199, 208, 439 A.2d 292 (1981); *Jacobs* v. *Goodspeed*, 180 Conn. 415, 416, 429 A.2d 915 (1980).

Moreover, I agree with the majority that we apply this familiar and deferential scope of review in light of

---

[1] I join fully in the reasoning and conclusion set forth in part I of the majority opinion. I agree with the outcome in part III of the majority opinion, yet I would reach that result based on my conclusion that the plaintiff, Cheryl Terry Enterprises, Ltd., had failed to present an adequate record for review. With regard to part IV of the majority opinion, I agree that "the trial court properly exercised its discretion in denying the relief requested."

the equally familiar principle that "damages must be proved with reasonable certainty. . . . Although we recognize that damages for lost profits may be difficult to prove with exactitude . . . such damages are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount with *reasonable certainty*." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin,* 247 Conn. 48, 69, 717 A.2d 724 (1998). "[T]he plaintiff cannot recover for the mere possibility of making a profit. . . . A damage theory may be based on assumptions so long as the assumptions are reasonable in light of the record evidence. . . . In order to recover lost profits, therefore, the plaintiff must present *sufficiently accurate and complete evidence* for the trier of fact to be able to estimate those profits with reasonable certainty." (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 70.[2]

Applying this deferential standard of review to the present case, I would conclude that the trial court did not abuse its discretion when it granted the motion of the defendant, the city of Hartford, to set aside the verdict. As the trial court noted, the plaintiff "presented no experts, statistics, financial records as to costs or any information from which a reasonable calculation of lost profits could be made for this contract." To the

---

[2] This court has articulated a number of factors to be taken into account when evaluating whether a plaintiff has proved lost profits to a reasonable certainty. Those factors include: a plaintiff's prior experience in the same business; the plaintiff's experience in the same enterprise subsequent to the interference; the experience of the plaintiff and that of third parties in a similar business when dealing with a new business; the average experience of participants in the same line of business as the injured party; and prelitigation projections. *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin,* supra, 247 Conn. 72–74. We have emphasized, however, that "[t]he underlying requirement for each of these types of evidence is a substantial similarity between the facts forming the basis of the profit projections and the business opportunity that was destroyed." Id., 74.

contrary, as the majority recognizes, the only evidence offered by the plaintiff in support of its claim for lost profits was the testimony of its president, Cheryl Terry. Before evaluating whether the trial court properly determined that Terry's testimony, standing alone, failed to prove damages to a reasonable certainty, it is important to first identify what information was *not* testified to by Terry.

First, Terry failed to testify about *any profits* the plaintiff actually had made under prior busing contracts. See *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, supra, 247 Conn. 72–73 (experience of plaintiff in same business probative on issue of lost profits); *Kay Petroleum Corp.* v. *Piergrossi*, 137 Conn. 620, 624–25, 79 A.2d 829 (1951) (profits earned by plaintiff in year prior to breach may be extrapolated to time remaining on contract breached by defendant); *Tull* v. *Gundersons, Inc.*, 709 P.2d 940, 945 (Colo. 1985) (trial court improperly excluded evidence of plaintiff's "past profit experience on other projects"); *Van Hooijdonk* v. *Langley*, 111 N.H. 32, 34, 274 A.2d 798 (1971) ("[a]n established business can usually provide data from which future prospects [of profitability] can reasonably be projected"); *White* v. *Southwestern Bell Telephone Co.*, 651 S.W.2d 260, 263 (Tex. 1983) (profits earned by plaintiff's florist shop prior to defendant's breach of contract relevant to determination of lost profits caused by defendant's failure to list plaintiff's business properly in telephone directory).

Second, Terry failed to testify about any profits that the plaintiff actually had made under subsequent busing contracts. See *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, supra, 247 Conn. 73 (plaintiff's experience in same enterprise subsequent to interference probative on issue of lost profits); *El Fredo Pizza, Inc.* v. *Roto-Flex Oven Co.*, 199 Neb. 697, 698, 261 N.W.2d 358 (1978) (increased profits earned after

faulty pizza oven replaced indicative of profits lost as result of defendant's breach of warranty of merchantability); *Cook Associates* v. *Warnick*, 664 P.2d 1161, 1165–66 (Utah 1983) (plaintiff's experience at unaffected plant relevant to lost profits projected for affected plant).

Third, Terry failed to testify about profits other participants in the busing industry had made under a contract with the defendant, or, more generally, under contracts with other towns. See *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, supra, 247 Conn. 73 (experience of third parties in similar business probative on issue of lost profits); *Chung* v. *Kaonohi Center Co.*, 62 Haw. 594, 611, 618 P.2d 283 (1980) (proper to base future profit calculation on experience of third party conducting virtually identical business at same location), overruled in part on other grounds, *Francis* v. *Lee Enterprises, Inc.*, 89 Haw. 234, 237, 971 P.2d 707 (1999); *Vickers* v. *Wichita State University*, 213 Kan. 614, 618, 518 P.2d 512 (1974) (approving of reliance on experience of others in same line of business). While the lack of this evidence is not, by itself, fatal, it would have "remove[d] the assessment of damages from the realm of speculation [by providing] . . . objective verifiable facts that bear a logical relationship to projected future profitability." *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, supra, 76.

Rather than testify about past profits the plaintiff or other companies actually had made under prior contracts, Terry merely testified that she always added 8 to 10 percent profit to her expenses to determine *the bid amount*, and that she "would have hoped for" the same amount for the contract with the defendant.[3] This

---

[3] In testifying generally about the bid preparation process, Terry stated: "You can't determine your price per bus until you have all [of your] costs factored in. This is how you come out with your cost per bus or cost per van when you have your driver pay scale and all of the above that I just

testimony is speculative on a number of different levels. First, Terry failed to present any evidence as to what profit expectation she in fact had added to prior bids, and merely claimed that she usually added a profit of 8 to 10 percent. Second, Terry failed to testify about profits the plaintiff *actually had earned* on those prior contracts, and limited her testimony to what she had included in the bid. While the former would have "remove[d] the assessment of damages from the realm of speculation"; *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, supra, 247 Conn. 76; the latter attempts to prove speculative future profit levels through mere speculation about past bid calculations. Third, the speculative nature of Terry's testimony was compounded by the fact that she was unable to testify accurately as to whether she added in an 8 percent profit projection, a 10 percent profit projection, or some other number to the bid submitted to the defendant. Instead, Terry merely testified that it was her normal practice to add an 8 to 10 percent profit level to bids. Given that the total bid amount was almost $6 million, that is a difference between a $480,000 profit at 8 percent, and a $600,000 profit at 10 percent, being factored into the bid. Put another way, the plaintiff's bid price of $5,862,097 was arrived at either by: (1) adding up the total costs for providing the services under the contract and adding an 8 percent profit; or (2) adding up the total costs for providing the services under the

mentioned. And then you come out with the total price. *Then you add your profit, which is usually between—I usually add 8 to 10 percent, hoping for the higher*, but I don't know until after that first year." (Emphasis added.)

With regard to the bid submitted to the defendant, the following colloquy occurred during the plaintiff's direct examination of Terry:

"Q. And what was the net present value of the five years in the [bid submitted to the defendant]?

"A. $5,862,097.

"Q. And of that, what was your anticipated profit?

"A. It would have been about 8 to 10 percent that I would have hoped for."

contract and adding a 10 percent profit.[4] It simply cannot be true, as the majority seems to accept, that Terry added up her costs and added in an expected profit of 8 to 10 percent. To reach the fixed price eventually submitted with the bid, Terry had to add in one or the other, not both.[5]

The majority places great emphasis on the fact that Terry "had approximately thirty years of experience in the school transportation industry and had been running her own school transportation company since 1984." On the basis of this experience, the majority states that "the jury reasonably could have concluded that Terry's anticipated profit of between 8 and 10 percent was appropriate." Although I agree that Terry, as well as the plaintiff, had substantial experience in the busing industry, I would conclude that this counsels

---

[4] With regard to how she calculated the bid submitted to the defendant, Terry testified: "I took my costs, as I always do, and add[ed] a profit, and that is all I can tell you because that is the way you do it."

[5] The majority claims that "the fact that the plaintiff's anticipated profit had ranged from 8 to 10 percent is not fatal to its claim for lost profits; that range of anticipated profit was sufficiently restrictive to permit the jury to determine the damages with reasonable certainty." This statement misses the point. The fact that the plaintiff may have adjusted its anticipated profit between 8 and 10 percent for varying bids it had made in the past is not relevant. What is relevant to the present case, however, is the profit level the plaintiff factored into the *specific bid* submitted to the defendant. Terry was unable to testify to that amount, and could only testify that in the past it had ranged from 8 to 10 percent. Indeed, the fact that Terry testified that it ranged from 8 to 10 percent indicates that it was always a firm number, and not a range, that she factored into a particular contract.

The record further reveals that the plaintiff had never provided busing services to the defendant before, and its prior contracts were with towns in the southeastern portion of Connecticut. The majority concludes that the fact that the plaintiff submitted the lowest bid indicates that "the plaintiff's bid was competitive in the industry." Although that may be true, it also may be true that the fact that the plaintiff submitted the lowest bid is evidence that the plaintiff reduced its normal profit level in order to win this contract, and expand its business into the central portion of the state. In sum, the fact that the plaintiff submitted the lowest bid has no bearing on a determination as to what the plaintiff's profit would have been if it had been awarded the contract.

strongly in favor of upholding the trial court's determination that the plaintiff had not proved lost profits to a reasonable certainty. Put another way, despite having over thirty years of experience in the busing industry, having calculated and submitted numerous bids for busing contracts, having performed busing services pursuant to contracts with several cities and towns, and presumably having earned a sufficient profit to remain in business for thirty years, Terry failed to testify about any profits the plaintiff actually had made over that time. To the contrary, she testified only that she normally added an 8 to 10 percent profit level *to the bid*. I cannot conclude, given her extensive experience in the business and all of the past financial information at the plaintiff's disposal, that the trial court abused its discretion by determining that Terry's testimony failed to prove damages to a reasonable certainty.

As the majority notes, "this court has recognized that, '[t]he vagaries of the marketplace usually deny us sure knowledge of what [the] plaintiff's situation would have been in the absence of the defendant's antitrust violation,' " and therefore a plaintiff in a typical antitrust case is subject to a " 'lesser burden of [proof] . . . .' " This case is not a typical antitrust case, however, as the plaintiff's situation was necessarily limited to an identifiable amount based on the figures set forth in the bid submitted to the defendant. As the trial court stated: "[T]his is not a case where the requirements of proof of lost profits should be relaxed because of the intricacies of proof presented by a complex antitrust case. The contract price was known, all that was needed was information about expenses which Terry at one time admitted she had calculated. This rather is a situation where evidence that could have been preserved and presented was not offered in court and, without that evidence, there can be no reasonable basis for the jury's determination of lost profits." See also *Doeltz* v.

*Longshore, Inc.*, 126 Conn. 597, 601, 13 A.2d 505 (1940) ("[w]hile the modern tendency is toward greater liberality in the requirements [for demonstrating lost profits] . . . it is the unvarying rule that evidence of such certainty as the nature of the case permits should be produced" [citation omitted]). The present case does not involve a scenario where the defendant's actions prevented an opportunity for limitless business growth, and the concomitant opportunity for the limitless accumulation of profits. To the contrary, the business activity of the plaintiff in the present case, and the concomitant opportunity to accumulate profits, was limited to the terms specified in the bid. The nature of the present case therefore required the plaintiff to present more certain evidence of lost profits than that provided by Terry's testimony. Id.

At the completion of Terry's testimony, the defendant moved to strike her testimony on the ground that she did not have the knowledge upon which to base an estimate of the profit built into the bid. Although the trial court denied the defendant's motion, it nevertheless warned counsel for the plaintiff that, "unless there is more offered in the way of facts and figures that [Terry] relied on, I may be in a position where I grant a motion for a directed verdict . . . ."[6] Despite this

---

[6] Specifically, the trial court stated: "My difficulty now is in [granting] a motion to strike if the trial isn't over, so I can't say that the testimony is not relevant, you know, as such. But I am telling you, counsel, in fairness to you, that unless it is tied up, I am going to have a problem, because one of the aspects of this case is a request for an injunction, and the other aspect of this case is a request for damages. . . . The law permits speculation, but in certain respects on future earnings, and the cases are pretty liberal. Like a claim for future earnings, but there has to be some foundational requirement. And [Terry] didn't remember any costs of this contract, she didn't remember maintenance, facilities, she had no access to these figures. And yet she says that she relies on these figures in determining what her bid price was and what her rate of profit is. . . . I can't say that her testimony was completely irrelevant, but I am telling you, counsel, unless there is more offered in the way of facts and figures that [Terry] relied on, I may be in a position where I grant a motion for a directed verdict . . . . And in fairness to you, I will allow you to recall her if she has figures."

cautionary statement from the trial court, the plaintiff failed to present any additional evidence concerning the preparation of the bid and Terry's profit estimates. Accordingly, the trial court found that Terry's testimony that, in her experience, she normally factored an 8 to 10 percent profit into a bid, without more, did not prove the plaintiff's lost profits under the proposed contract to a reasonable certainty. See *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, supra, 247 Conn. 72 (trial court abused discretion in awarding damages for lost profits where plaintiff did not prove lost profit damages to reasonable certainty). On the record before us, considering the factors this court outlined in *Beverly Hills Concepts, Inc.*,[7] and indulging every reasonable presumption in favor of the trial court's action; *Howard* v. *MacDonald*, supra, 270 Conn. 127; I would conclude that the trial court did not abuse its discretion in granting the defendant's motion to set aside the verdict.

In reaching this conclusion, I am guided by this court's decision in *Doeltz* v. *Longshore, Inc.*, supra, 126 Conn. 597. In *Doeltz*, the plaintiff had leased a refreshment concession from the defendant for $500 plus 5 percent of the gross receipts for the summer season. Id., 598. Under the terms of the lease, the defendant was to equip the bar and permit the plaintiff to have the exclusive sales of beverages and food on the defendant's premises. Id. Despite the terms of the lease, the plaintiff alleged that the bar was not equipped and ready for him on the agreed date, and that the defendant subsequently interfered with the operation of the plaintiff's business. Id., 598–99. The plaintiff brought an action against the defendant seeking, inter alia, an award of lost profits. Id., 599. In support of his claim for lost profits, the plaintiff testified that he "usually figure[d] on the liquor 100 percent [profit] and [on the]

---

[7] See footnote 2 of this concurring and dissenting opinion.

food 50 percent [profit]." (Internal quotation marks omitted.) Id. On the basis of those usual profit margins, the plaintiff testified that he averaged a 75 percent profit, and, therefore, if he lost $3750 in business due to the defendant's interference, then his lost profits were $2500.[8] Id. The jury returned a verdict for the plaintiff in the amount $2500, and the trial court denied the defendant's subsequent motion to set aside the verdict. Id. On appeal, this court reversed the judgment of the trial court, concluding that the "unsatisfactory and conjectural character [of the plaintiff's evidence] is plain." Id., 601. In so concluding, this court noted, inter alia, that "no data whatever as to his costs, other than rent, were shown nor was there any testimony to the effect that such data were not available." Id. Moreover, the court noted that the plaintiff's estimation of a 75 percent profit level "was a pure guess and was wholly unsupported as to either the amount of business lost or the profit to be expected." Id., 602.

The facts of *Doeltz* and the present case are similar in several important respects. First, both the plaintiff's testimony in *Doeltz* and Terry's testimony in the present case were predicated upon unsupported claims of "usual" profit margins. Just as there was no evidence in *Doeltz* to support the claimed average of 75 percent profits, there was no evidence in the present case to support the claimed level of 8 to 10 percent profit. Moreover, the plaintiff's testimony in *Doeltz* contained speculation about usual profits *earned* in his business. Terry's testimony in the present case, however, concerned speculative profit levels set forth in a bid, rather than speculation over past profits actually earned. If

[8] Although $2500 is slightly less than 75 percent profit of $3750 in sales, the plaintiff stated that the lower amount was applicable because "[s]ometimes you give something away free of charge, and so forth, you know, the kids come in for ice cream cones and sometimes you give a drink away on the house." (Internal quotation marks omitted.) *Doeltz* v. *Longshore, Inc.*, supra, 126 Conn. 599.

the testimony in *Doeltz* was insufficient because it was speculative, then surely Terry's testimony was insufficient as well. Second, in both cases, no data whatsoever was presented by the plaintiff as to relevant costs, nor was there testimony in either case that this data was unavailable. Therefore, I would conclude in the present case, just as this court concluded in *Doeltz*, that the "unsatisfactory and conjectural character [of Terry's testimony] is plain." Id., 601.

This conclusion is buttressed by an examination of other cases in which this court has addressed awards for lost profits. In those cases where the award was affirmed, the plaintiff had presented specific evidence, beyond mere speculation, which supported the award. See, e.g., *Westport Taxi Service, Inc.* v. *Westport Transit District*, 235 Conn. 1, 29, 664 A.2d 719 (1995) (affirming award of lost profits where "trial court made meticulous findings of fact and clearly detailed its calculations regarding the plaintiff's damages" based on, inter alia, specific figures in evidence regarding average taxi fares, yearly rides and commissioner's guidelines for fair rate of return);[9] *Burr* v. *Lichtenheim*, 190 Conn.

---

[9] The majority's reliance on *Westport Taxi Service, Inc.* v. *Westport Transit District*, supra, 235 Conn. 1, in support of its conclusion is misplaced. To begin with, much of the discussion the majority cites to from *Westport Taxi Service, Inc.*, is contained in the part of that opinion addressing the defendant's challenge to the trial court's award of $150,000 for the loss of the business, and not the part of that opinion addressing the defendant's challenge to an award of $12,144 in lost profits. See id., 32–35. Second, within that part of *Westport Taxi Service, Inc.*, addressing the award for lost profits, this court noted that the trial court, as the trier of fact in that case, had "sufficient evidence" from which to make "reasonable assumptions" concerning lost profits. Id., 32. That sufficient evidence included, inter alia, evidence that the plaintiff collected a $1.80 average fare, that the state commission would have approved a fare increase to the rate of $2.70, that surrounding communities were charging an average fare of $2.70, and that the commission considered a reasonable rate of return to be a ratio of operating costs to gross revenue of between 85 and 95 percent. Id., 30–31. That level of evidence simply was not presented by Terry in the present case. Thus, while the majority is correct that the owner in *Westport Taxi Service, Inc.*, properly was allowed to testify that a fair rate of return on a

351, 361, 460 A.2d 1290 (1983) (affirming award of lost profits where plaintiff "introduced, as an exhibit, a contract for sale of that property for $25,000 [that was lost by the plaintiff] . . . [and] expert testimony that he might reasonably have expected to make a profit of $23,000 to $25,000 had he been able to build [on a separate piece of land] in 1976"); *Humphrys* v. *Beach*, 149 Conn. 14, 20, 175 A.2d 363 (1961) (award of $3500 for lost profits over one year and three months had sufficient support in record, namely, "evidence that the [plaintiff's] profit in 1955 was $3500, and that it was about half of that amount during the first half of 1956"); *Kay Petroleum Corp.* v. *Piergrossi*, supra, 137 Conn. 624 (award of $3025 for lost profits over three years and nine months had sufficient support in record, namely, evidence that plaintiff had profit of $806.57 in prior year); *Kastner* v. *Beacon Oil Co.*, 114 Conn. 190, 194, 158 A. 214 (1932) (award for lost profits reasonably supported by testimony from owner that, inter alia, in 1928, net profit was about $3400, and in 1929, gross profit was $3200, and net profit was something less due to family illness).

Moreover, in other cases this court has found that awards for lost profits were not proved to a reasonable certainty, despite the fact that the plaintiff had presented more significant evidence than was presented by the plaintiff in the present case. See, e.g., *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, supra, 247 Conn. 68 (vacating trial court's award of $15.9 million in lost profits for prospective period of twelve years because not proved to reasonable certainty where testimony from plaintiff's expert on future sales

taxi business would be 10 to 12 percent, the trial court "applied this rate of return to *its own calculations of the plaintiff's lost profits* and concluded that the plaintiff's value was $150,000." (Emphasis added.) Id., 34. Put another way, the award for lost value of business was based on calculations made from the "sufficient evidence" of lost profits presented by the plaintiff; id., 32; evidence that is completely absent in the present case.

of franchises too speculative to support award); *Gargano* v. *Heyman*, 203 Conn. 616, 620, 525 A.2d 1343 (1987) (despite fact that "[t]o support his claim for damages, the plaintiff offered his 1983 and 1984 federal income tax returns and testimony concerning an offer to purchase his business," this court affirmed state trial referee's finding that plaintiff had failed to prove lost profits to reasonable certainty); *West Haven Sound Development Corp.* v. *West Haven*, 201 Conn. 305, 324–27, 514 A.2d 734 (1986) (despite fact that expert was certified public accountant, university professor and had coauthored college textbook on securities analysis and business valuation, award based on present value of future profits vacated because expert used faulty calculations and assumptions;); *Gordon* v. *Indusco Management Corp.*, 164 Conn. 262, 275–76, 320 A.2d 811 (1973) (evidence that similar business had grossed "$175,000 and had net profit of 12 percent of gross receipts" insufficient to support $21,000 award for lost profits because plaintiff had more expenses to subtract from gross revenue than other business had).

This court has stated that "[a] damage theory may be based on assumptions so long as the assumptions are reasonable in light of the record evidence." (Internal quotation marks omitted.) *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin,* supra, 247 Conn. 70. I continue to adhere to the sentiments expressed in that statement. As the foregoing discussion illustrates, however, this court consistently has required a higher level of "record evidence" to support an award for lost profits than that which was submitted in the present case. The majority's conclusion therefore represents a significant departure from our prior cases.

I recognize that my conclusion would mean that the defendant, whose antitrust violations caused the plaintiff's harm, would escape virtually unscathed. Although troubling, "[t]his outcome is a direct result of the plain-

tiff's choice of evidence." Id., 78. As the trial court aptly noted, "[i]f the expense figures had been preserved and presented at trial, it would have been possible for the jury to have a nonspeculative basis to determine lost profits. . . . [W]ithout that evidence, there can be no reasonable basis for the jury's determination of lost profits."

I therefore respectfully dissent, and would affirm the judgment of the trial court granting the defendant's motion to set aside the verdict on the ground that the plaintiff failed to prove lost profits to a reasonable certainty.